**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**FRANCISCO DEJESUS, HERRON EMERENCIANO,**
**and RASHAD SCOTT,**

                                   *Plaintiffs,*                    **AMENDED COMPLAINT**

             -against-                                              **9:18-cv-00372-GTS-DJS**

**ANTHONY ANNUCCI, Acting Commissioner, New**
**York State Department of Corrections and Community**
**Supervision, MICHAEL KIRKPATRICK, Former**
**Superintendent, Clinton Correctional Facility,**
**DONALD VENETTOZZI, Director, Special Housing**
**and Inmate Discipline, MICHAEL DIXON, Sergeant,**
**Clinton Correctional Facility, JEFFERY ROCK,**
**Lieutenant, Clinton Correctional Facility, EARL BELL,**
**Deputy Superintendent of Security, Clinton Correctional**
**Facility, JERRY KOWALOWSKI, Recreation Program**
**Leader, Clinton Correctional Facility, DANIEL**
**HOLDRIDGE, Captain, Clinton Correctional Facility,**
**KAREN CROWLEY, Office Assistant II - Mailroom,**
**Clinton Correctional Facility, RICHARD HOUCK,**
**Correction Analyst, CHRISTINE GREGORY, Inmate**
**Grievance Resolution Committee Supervisor, Clinton**
**Correctional Facility,**

                                   *Defendants.*
_____

1

## PRELIMINARY STATEMENT

1.      This is a civil rights action by current and former state prison inmates, pursuant to 42 U.S.C. § 1983. Plaintiffs seek compensatory and punitive damages, as well as certain injunctive and declaratory relief, for adverse actions taken against them at Clinton Correctional Facility (hereinafter "Clinton") in 2015 and 2016. Plaintiffs' claims stem from incidents that occurred after Richard Matt and David Sweat, both housed in Clinton's Honor Block, escaped from prison on June 6, 2015. At the time of the escape, plaintiffs were incarcerated at Clinton and were, or shortly thereafter became, members of the prisoner-elected Inmate Liaison Committee (ILC). The adverse actions taken by defendants included retaliatory misbehavior reports, resulting wrongful confinement in solitary confinement, loss of plaintiffs' ILC position, loss of work and program assignments, including the opportunity to complete required programming for parole and the opportunity for release from prison, loss of wages, property loss, unscheduled retaliatory transfers, and the suppression of speech with members of the news media.

2.      The Plaintiffs faced adverse staff actions for their legally protected activities in performing the duties of communicating grievances and concerns between their respective housing blocks and the administration. These actions are in violation of plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.

## JURISDICTION

3.      This court has jurisdiction of plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343 and 28 U.S.C. §§ 2201, 2202.

4.      Remedies are sought under 42 U.S.C. §§ 1983 and 1988 for violations of plaintiffs' rights under the Constitution of the United States.

5.      Venue is proper because the events at issue occurred in the Northern District of New York. 28 U.S.C. § 1391(a)(2).

## PARTIES

6.      Plaintiff FRANCISCO DEJESUS is not presently incarcerated, but during all dates and times relevant to this complaint, was an inmate confined in the custody of DOCCS at Clinton Correctional Facility (hereinafter "Clinton") in Dannemora, New York, and at Great Meadow Correctional Facility (hereinafter "Great Meadow") in Comstock, New York.

7.      Plaintiff HERRON EMERENCIANO is not presently incarcerated, but during all dates and times relevant to this complaint, was an inmate confined in the custody of DOCCS at Clinton Correctional Facility in Dannemora, New York and Upstate Correctional Facility (hereinafter "Upstate") in Malone, NY.

8.      Plaintiff RASHAD SCOTT is presently in the custody of DOCCS at Green Haven Correctional Facility (hereinafter "Green Haven") in Stormville, NY. At all times relevant to this complaint, he was a prisoner confined at Clinton Correctional Facility in Dannemora, New York.

9.      Defendant ANTHONY ANNUCCI is the Acting Commissioner for the New York State Department of Corrections and Community Supervision ("DOCCS") and as such he is charged with the overall supervision of the Department of Corrections and Community Supervision. Appeals from Superintendent's Tier III proceedings are submitted to his office for administrative review. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

10.     Defendant MICHAEL KIRKPATRICK is the former Superintendent of Clinton Correctional Facility and at all times relevant to this complaint, was charged with the overall supervision of Clinton Correctional Facility and responding to facility level grievances. He was also a member of the facility Executive Team which met regularly with the Inmate Liaison Committee. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

11.     Defendant DONALD VENETTOZZI is the Director of the Office of Inmate Discipline and Special Housing and as such, reviews appeals from Superintendent's Tier III proceedings conducted at New York State correctional facilities. As a representative of the Commissioner's office, he affirmed the determinations made at Plaintiff DeJesus' and Plaintiff Emerenciano's Tier III proceedings which are the subject of this complaint. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

12.     Defendant MICHAEL DIXON is a Sergeant at Clinton Correctional Facility and authored the misbehavior report against Plaintiff DeJesus which is at issue in this complaint. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

13.     Defendant JEFFERY ROCK is a Lieutenant at Clinton Correctional Facility and acted as Hearing Officer in the Superintendent's Tier III Hearing against Plaintiff DeJesus, which is at issue in this complaint. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

4

14.     Defendant EARL BELL is the former Deputy Superintendent of Security at Clinton Correctional Facility and was a member of the facility's Executive Team which met regularly with the Inmate Liaison Committee. He also acted as Hearing Officer in the Superintendent's Tier III proceeding against Plaintiff Emerenciano, which is at issue in this complaint. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

15.     Defendant JERRY KOWALOWSKI is the former Recreation Program Leader at Clinton Correctional Facility, and was the Inmate Liaison Committee Staff Coordinator. He is the author of the misbehavior report against Plaintiff Emerenciano, which is at issue in this complaint. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

16.     Defendant DANIEL HOLDRIDGE is a Captain at Clinton Correctional Facility and was responsible for ordering the destruction of Plaintiff Scott's mail from members of the media. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

17.     Defendant KAREN CROWLEY is an Office Assistant II – Mailroom employee of Clinton Correctional Facility who worked in the mailroom, or had authority over the mailroom on September 8, 2015. This person was responsible for ordering the destruction of Plaintiff Scott's mail from members of the media. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

18.     Defendant RICHARD HOUCK is a Corrections Analyst who was responsible for ordering the unscheduled transfer of Plaintiff Scott, who was transferred on or around October

27, 2015. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

19.     Defendant CHRISTINE GREGORY was the Inmate Grievance Resolution Committee (hereinafter "IGRC") Supervisor on or around September 22, 2015. As the IGRC Supervisor, this person was aware of Plaintiff Scott's grievances and made statements to Plaintiff Scott intending to curtail his use of the grievance system. Defendant is a person under 42 U.S.C. § 1983, at all times acted under color of law, and is sued in his official and individual capacities.

## STATEMENT OF FACTS

### Facts Relevant to All Plaintiffs

20.     Plaintiffs were elected inmate representatives to the Inmate Liaison Committee (ILC) while housed at Clinton Correctional Facility (hereinafter "Clinton") in June 2015 or within months thereafter.

21.     The stated objective of the ILC, according to DOCCS Directive No. 4002, is to provide, "A) Effective communications between inmates and administration for accurate dissemination and exchange of information; and B) A means to facilitate consideration and analysis of suggestions from inmates relative to facility operations."

22.     In accordance with the objectives of the ILC, members regularly meet with members of the correctional facility's Executive Team regarding "matters concerning the general welfare of the inmate population." *See* DOCCS Directive 4002.

23.     The ILC, and all Plaintiffs, were selected through an election by prisoners on each housing unit or housing block.

24.     According to DOCCS Directive 4002, "The term of membership on the ILC shall be six months" and a prisoner can serve up to two consecutive elective terms.

25.     Clinton has both the "Clinton Main" facility, a gallery-style maximum security prison and the "Clinton Annex" facility, a smaller dormitory-style maximum security prison.

26.     Both Clinton Main and Clinton Annex have an elected ILC.

27.     Plaintiffs Emerenciano and Scott were elected members of the ILC in Clinton Main and Plaintiff DeJesus was an elected member of the ILC in the Clinton Annex during all times relevant to this complaint.

28.     Each housing unit at Clinton Main elects two prisoners to represent their interests on the ILC; the Clinton Annex has fewer elected representatives.

29.     The ILC is considered to be an inmate grievance body and Plaintiffs, as ILC members, were authorized to file or voice grievances on behalf of the prison population. *Dolan v. Connolly*, 794 F.3d 290 (2d Cir. 2015).

30.     The escape of Richard Matt and David Sweat occurred on June 6, 2015 from the A-Block, or "Honor Block" at Clinton.

31.     The Honor Block was a program that was terminated at Clinton shortly after the escape.

32.     The termination of this program was the subject of ILC discussions and inmate grievances from the A-Block.

33.     In the weeks following the escape, all housing blocks in Clinton were placed on "lockdown" and plaintiffs and other prisoners were confined to their cells. Over the course of

7

several weeks, while searches for the escaped prisoners continued, a number of prisoners complained of officer misconduct directed towards them or other prisoners.

34.     In the months following the escape, prisoners continued to make complaints of staff misconduct as staff were implicated in the escape.

35.     Plaintiffs were responsible for communicating grievances and concerns between their respective housing blocks and the administration.

36.     Eleven ILC members from the Clinton Main authored a letter to Defendant Annucci on July 12, 2015 ("July 2015 ILC Letter") shortly after the apprehension of the escapees.

37.     The July 2015 ILC Letter was addressed not only to Defendant Annucci, but copied to Assemblyman Daniel O'Donnell, then Chairman of the Committee on Correction, the New York State Inspector General's Office, Correctional Association of New York, and Prisoners' Legal Services of New York.

38.     The July 2015 ILC Letter, written by ILC members "acting in [their] capacity as elected Inmate Liaison Committee representatives," requested a meeting between the ILC, DOCCS Central Office, and the Governor's Inspector General's Office outside the presence of staff or administration from Clinton to discuss problems and concerns at the facility.

39.     The July 2015 ILC Letter relays concerns about assaults on prisoners by staff with supervisory staff approval, destruction of prisoners' property, the elimination of incentive programs, the restriction of telephones, destruction of submitted grievances, and financial impropriety with the Inmate Benefit Fund account.

8

40.     In August 2015, New York Assemblyman Daniel O'Donnell and Prisoners' Legal Services Executive Director Karen Murtagh met with members of the Clinton Main ILC to discuss the content of the July 2015 ILC letter.

41.     The Correctional Association of New York also met with certain ILC members and prisoners in Clinton Main and Annex in August 2015 to discuss the July 2015 ILC Letter.

42.     These meetings, along with several articles in the New York Times and local newspaper Press Republican, called a great deal of attention to the accusations against staff in both their involvement in the prison escape and the reports of staff abuse following the escape. *See*, Susanne Craig, William K. Rashbaum, and Benjamin Miller, *New York Prison Escapee Traded Art for Favors from Guard*, New York Times, June 25, 2015; Michael Schwirtz and Michael Winerip, *After 2 Killers Fled, New York Prisoners Say, Beatings Were Next*, New York Times, August 11, 2015; Joe LoTemplio, *71 Inmates Claim Beatings After Escapes*, Press Republican, Aug. 12, 2015.

43.     One article quoted an unnamed correctional officer from Clinton stating, "They [inmates] used to walk with their heads down, not making eye contact; now they glare at you and smirk." Joe LoTemplio, *Changes Inside Clinton Since Escape*, Press Republican, Feb. 3, 2016

44.     Upon information and belief, Defendants Annucci and Kirkpatrick were aware of these meetings and reports regarding the ILC's concerns about living conditions and staff malfeasance.

45.     The communications between the ILC, elected officials, legal organizations, and the news media were a motivating factor in the retaliatory misbehavior reports and unscheduled transfers of the plaintiff ILC members.

9

46.     Minutes of the ILC Meetings from the Clinton Main reflect eleven (11) ILC members in attendance at the ILC Meeting on June 3, 2015, three days before the escape, and only three (3) ILC members in attendance at the ILC Meeting in April 2016.

47.     Upon information and belief, the reduction in ILC members at the ILC meetings described in ¶46 above was due to unwarranted misbehavior reports, unscheduled transfers, and other retaliatory actions against ILC members by defendants and other DOCCS staff.

48.     The intentional turnover of the ILC members was an attempt by defendants to silence grievances and complaints of staff malfeasance.

49.     Plaintiffs faced adverse action for their legally protected activities.

50.     Plaintiffs' counsel sent a letter relaying specific concerns and details regarding much of the retaliation described in this complaint to Defendant Annucci on or around March 20, 2016.

51.     Plaintiffs have exhausted their administrative remedies, or are not required to do so under the Prison Litigation Reform Act (PLRA) because they are no longer "prisoners."

### Facts Relevant to Plaintiff Francisco DeJesus

52.     Plaintiff DeJesus was housed in the Clinton Annex beginning on or around March 9, 2015, and elected to the ILC in August 2015 to represent prisoners in the 40-1 Building.

53.     During Plaintiff DeJesus' service on the ILC, complaints of assaults by staff at the 460 Gate, as well as verbal harassment by staff, were being raised in the ILC meetings by ILC members, including Plaintiff DeJesus.

54.     Beginning on or around December 3, 2015, approximately 20 prisoners housed in Building 40-1 filed grievances with the Inmate Grievance Resolution Committee (IGRC) regarding the prohibition of domino games by Correctional Officer ("CO") Benware.

55.     Plaintiff DeJesus and other prisoners in Building 40-1 complained to the IGRC that the prohibition on playing domino games was improper because it was a common activity among prisoners and no prison rules were violated when the game was played.

56.     Plaintiff DeJesus, as ILC Representative for 40-1 Building, had previously sent Defendant Superintendent Kirkpatrick a separate letter regarding this issue on or around November 18, 2015.

57.     Plaintiff DeJesus also filed a grievance regarding the prohibition of domino games on December 3, 2015.

58.     In his role as ILC Representative, Plaintiff DeJesus wrote another letter to Defendant Superintendent Kirkpatrick the following month, on January 4, 2016, regarding retaliation against the prisoners in Building 40-1 by correctional staff.

59.     Plaintiff DeJesus' letter to Defendant Superintendent Kirkpatrick relayed allegations of retaliation by CO Benware and CO Favreau, including verbal harassment and threats of physical harm, threats of placement into Keeplock or solitary confinement, and the theft of prisoners' food as a result of filing the above-referenced grievances in ¶¶ 54 – 57.

60.     On January 5, 2016, Defendant Superintendent Kirkpatrick responded to Plaintiff DeJesus' grievance, and the grievances of other Building 40-1 inmates, concluding, "There is no evidence of staff malfeasance" regarding the dominoes games, and declined to take any further action.

61.     Plaintiff DeJesus appealed Defendant Superintendent Kirkpatrick's decision on the grievance to the Central Office Review Committee (CORC) on January 6, 2016.

62.     During this same time, on or around January 3, 2016, Plaintiff DeJesus wrote a letter to the State Commission of Correction (SCOC) requesting that a "formal complaint" be filed with the SCOC regarding retaliation against the prisoners in Building 40-1, including verbal harassment and threats of physical harm, as a result of filing the above-referenced grievances.

63.     This January 3, 2016 letter to the SCOC stated that approximately 20 prisoners filed grievances against two correctional officers for prohibiting them from playing dominoes, and that after the filing of those grievances the 40-1 Building kitchen and TV room, to which prisoners generally have consistence access, were shut down more frequently than before, verbal harassment and threats of physical harm were made by correctional staff, along with an increase in threats of placement into solitary confinement.

64.     Plaintiff DeJesus ended his January 3, 2016 letter to the SCOC with the following paragraph, in its entirety:

> Lastly, it is to be noted that any physical bodily harm rendered upon the grievant and/or any destruction to my property and/or any fabrication of contraband: drug, weapons, etc …onto the grievant herein, will be deemed a form of retaliation by the named officers herein the body of this complaint and a civil action will be pursued in a court of law against C.O. Benware and C.O. Favreau and any other person(s) who acts on behalf [of] the aforementioned officers.

65.      Because Plaintiff DeJesus mailed the SCOC letter to an incorrect address, the letter was returned to Clinton and received in the Superintendent's Office on January 19, 2016, where upon information and belief, it was read by Defendant Superintendent Kirkpatrick.

66.    On January 27, 2016, a Tier III misbehavior report was issued by Defendant

Sergeant Dixon, charging Plaintiff DeJesus with threats and harassment. The description of the

incident in the misbehavior report, states in its entirety:

On the above date [January 27, 2016] at approx. 4pm inmate DeJesus 15-B-0543 was interviewed in the IGRC office regarding his complaint against Officers Benware and Favreau while on 40-1 building. During [the] interview, inmate clearly communicated to me that he will have problems with Officers Benware and Favreau if they attempt in any way to discipline him for any misconduct he is observed doing. Additionally, inmate states in written complaint addressed to State Commission of Corrections that any attempt to discipline him will result in a "Civil Action" against the above mentioned Officers. Based on my 22 years of experience with DOCCS, statements made by inmate Desjesus [sic] equate to a clear threat to the operation of 40-1 building where he is housed as well as the safety of Officers Benware and Favreau, who work there. **Inmate is attempting to undermine the officers authority on this housing unit by threatening them with a civil action.** For the safety and security of Inmate DeJesus, the Facility, Officers Benware and Favreau, inmate DeJesus is being keeplocked pending disciplinary action by higher authority. Inmate is being charged with making threats. (emphasis added).

67.    On February 12, 2016, Defendant Lieutenant Rock, acting as hearing officer for

the Tier III hearing, found Plaintiff DeJesus guilty of both threats and harassment.

68.    Defendant Lieutenant Rock's Statement of Evidence Relied Upon, states in

relevant part:

The attached written complaint [to the SCOC] that you admit to writing that clearly reflects threatening action as well as a subversive effort on your behalf to discourage or deter staff from performing their duties due to such threats […] IGRC Supervisor testified that had your complaint been a grievance with all the protections afforded to a grievance that a misbehavior report would be warranted for the paragraph in question [*See* Paragraph 66, *supra*] […] It is not acceptable to threaten any action against staff that would deter staff from their duties, especially in regards to you as an individual.

69.    Defendant Lieutenant Rock imposed a penalty of 90 days Keeplock and also

imposed 90 days loss of packages, commissary, phone, and recreation.

70.     Keeplock is a form of 23-hour per day isolated confinement, and may be served in either the prisoner's own cell, in a block of keeplock cells, or in the Special Housing Unit (SHU). *See* DOCCS Directive 4933.

71.     Plaintiff DeJesus served his Keeplock sanction in a "Keeplock block" in the Clinton Annex and was deprived of his own property, outside of the allowable items in DOCCS Directive 4933, and unable to purchase commissary items, use the telephone to call his family, or have more than one-hour of recreation.

72.     Plaintiff DeJesus submitted an appeal of the disposition to the Commissioner's designee, Defendant Venettozzi, on or around March 9, 2016 and an amended appeal on or around March 10, 2016.

73.     Plaintiff DeJesus' counsel submitted a preliminary appeal to the Commissioner's designee, Defendant Venettozzi, on or around March 3, 2016, as well as a supplemental appeal on June 7, 2016.

74.     The appeals submitted by Plaintiff DeJesus and his counsel all detailed to Defendant Venettozzi the due process violations which occurred at the disciplinary hearing and the retaliatory nature of the misbehavior report.

75.     Defendant Venettozzi did not reverse and expunge this incident from Plaintiff DeJesus' record until June 3, 2016, long after Plaintiff DeJesus had served the full Keeplock penalty.

76.     Plaintiff DeJesus was confined in the Keeplock cell block of the Clinton Annex without access to phones, commissary, or packages until March 29, 2016, or for 60 days, when he completed his Keeplock sanction, after reductions for good behavior.

14

77.     At the time the misbehavior report was issued, Plaintiff DeJesus was only weeks away from successfully completing his recommended programming requirement, the Computer Vocational Program.

78.     Plaintiff DeJesus was eligible to receive merit time and obtain early release under New York Correction Law §803.

79.     Due to Plaintiff DeJesus' confinement in Keeplock for this retaliatory misbehavior report, he was unable to complete his recommended programming requirement, and thus lost his ability to qualify for an opportunity to appear before the merit parole board in June 2016, and lost the opportunity to be released from prison early.

80.     Due to Plaintiff DeJesus' confinement in Keeplock for this retaliatory misbehavior report, he was confined in DOCCS custody for an additional four months, until October 5, 2016, when he was granted conditional release.

81.     Plaintiff DeJesus was also scheduled for preference transfer to the Wende Hub closer to his home in Buffalo, New York, but was instead transferred to Great Meadow Correctional Facility.

82.     Plaintiff DeJesus lost his position on the ILC and lost wages due to this retaliatory confinement.

83.     Defendants Annucci, Superintendent Kirkpatrick, Sergeant Dixon, Lieutenant Rock, and Venettozzi took adverse action against, or failed to intervene or mitigate such actions against Plaintiff DeJesus for engaging in constitutionally protected conduct.

84.     Defendants Rock and Venettozzi violated Plaintiff DeJesus' due process rights, as there was no evidence to support the disciplinary charges.

15

85.     Plaintiff DeJesus is no longer a prisoner confined by DOCCS.

**Facts Relevant to Plaintiff Herron Emerenciano**

86.     Plaintiff Emerenciano was housed in Clinton beginning on or around August 12, 2013, and elected to the Clinton Main ILC in April 2015 to represent prisoners from the C-Block.

87.     Plaintiff Emerenciano was one of eleven ILC members who authored the letter to Defendant Annucci on July 12, 2015 ("July 2015 ILC Letter") shortly after the apprehension of the escapees. *See* ¶¶ 36 – 39, *supra*.

88.     The July 2015 ILC Letter was addressed not only to Defendant Annucci, but copied to Assemblyman Daniel O'Donnell, then Chairman of the Committee on Correction, the New York State Inspector General's Office, Correctional Association of New York, and Prisoners' Legal Services of New York.

89.     The July 2015 ILC Letter, written by Plaintiff Emerenciano and others, "acting in [their] capacity as elected Inmate Liaison Committee representatives," requested a meeting between the ILC, DOCCS Central Office, and the Governor's Inspector General's Office outside the presence of staff or administration from Clinton to discuss problems and concerns at the facility.

90.     The July 2015 ILC Letter relays concerns about assaults on prisoners by staff, with supervisory staff approval, destruction of prisoners' property, the elimination of incentive programs, the restriction of telephones, destruction of submitted grievances, and financial impropriety with the Inmate Benefit Fund account.

91.     In relevant part, the July 2015 ILC Letter states:

"Assaults on inmates by staff continue in side rooms and out-of-view hallways and landings and this Committee is fearful of the potential danger and threat to life […] [W]e would be remiss in our duties as elected representatives of the population to not report these problems, incidents, and concerns to you in your capacity as Acting Commissioner of the Department. We are merely convicts, but even we can see the clear and present danger which exists at this facility and we sincerely hope you will not turn a blind eye towards this letter and its contents […] [T]his letter is submitted in good intent and we expect no reprisals for our good faith reporting of our concerns."

92.     In August 2015, New York Assemblyman Daniel O'Donnell and Prisoners' Legal Services Executive Director Karen Murtagh met with the Clinton ILC, including Plaintiff Emerenciano, regarding the contents of the July 2015 ILC Letter.

93.     Plaintiff Emerenciano also met and spoke with representatives from the Correctional Association of New York when they visited Clinton in August 2015.

94.     Upon information and belief, Defendants Annucci and Kirkpatrick were aware of these meetings and the concerns regarding living conditions and retaliation expressed by ILC members.

95.     The minutes for the August 21, 2015 ILC meeting reflect that the ILC, including Plaintiff Emerenciano, raised certain issues with Defendant Superintendent Kirkpatrick, Defendant Deputy Superintendent of Security ("DSS") Bell, Captain Bishop, and Defendant Recreation Program Leader ("RPL") Kowalowski including, "population is expressing issues with physical and verbal abuse by officers without impunity to the extent of abuse of authority," and issues regarding missing deposits into the Inmate Benefit Fund, which Defendant Kowalowski was responsible for overseeing.

96.     In the months following the escape, Plaintiff Emerenciano also claimed he was not being called out for weekly ILC meetings, and was thus missing the opportunity to meet with other ILC members during this time and report on issues faced by the C-Block.

97.     Plaintiff Emerenciano brought this matter to the attention of Defendant RPL Kowalowski, who served as the ILC staff advisor. When he continued to be left in his cell rather than to be called out for the ILC meetings, Plaintiff Emerenciano filed a grievance on this matter and requested that Defendant RPL Kowalowski be removed from supervising the ILC.

98.     Following an ILC meeting on October 2, 2015, Defendant RPL Kowaloski issued Plaintiff Emerenciano a misbehavior report.

99.     The misbehavior report, which was not issued until after the full ILC meeting had ended, charged Plaintiff Emerenciano with the following violations of the Standards of Inmate Behavior: 102.10 ("Rule Series 102 Threats") and 104.12 ("Rule Series 104 Riot, Disturbances, and Demonstrations"), alleging that on October 2, 2015:

> "[D]uring the ILC meeting in my presence and other ILC members, [Emerenciano] spoke about Wednesday's fight in the North Yard. He stated that inmates were made to sit on the ground for 20-30 minutes after the fighters were taken out of the yard. He stated if this continues we will have another 83. (83 was Clinton's riot). He then stated it will only take one guy to stand up and the whole yard will stand up. Emerenciano was directing his comments to the other members of the ILC."

100.    Several days before this ILC meeting on October 2, 2015, there was a fist fight in the North Yard at the time Plaintiff Emerenciano's block was in the yard for recreation.

101.    In accordance with a new yard policy, all prisoners in the yard, including Plaintiff Emerenciano and others from his block, were required to sit on the muddy ground for approximately thirty minutes.

102.    The yard policy, as enforced against Plaintiff Emerenciano's block, required prisoners to sit on the ground for extended periods of time after any incident, even if the ground was wet or muddy, and even if the prisoner was disabled or elderly.

103.    Plaintiff Emerenciano received many complaints from prisoners about this policy, and at the ILC meeting on October 2, 2015, raised it as a matter of concern, and expressed how this new policy had caused significant discontent among prisoners in his block.

104.    Upon information and belief, this yard policy was promulgated by Defendant DSS Bell.

105.    After the ILC meeting on October 2, 2015, Plaintiff Emerenciano was moved to Upstate Correctional Facility ("Upstate") on the same day. The misbehavior report was served on Plaintiff Emerenciano three days later at Upstate, on October 5, 2015.

106.    Plaintiff Emerenciano testified at his disciplinary hearing that he had no knowledge of "83," or any related incident, and denied that he ever made any threats or attempted to incite a demonstration.

107.    On October 8, 2015, Plaintiff Emerenciano's Tier III Superintendent's Hearing concerning the misbehavior charges commenced at Upstate.

108.    The hearing was presided over by Defendant DSS Bell, the promulgator of the questioned yard policy, who then acted as the hearing officer at the hearing.

109.    Generally, the Superintendent of a facility in which a prisoner is housed has the authority to appoint a member of his or her staff to conduct Tier III hearings at that facility.

110.   Upon information and belief, it was highly irregular for Defendant DSS Bell, as a member of the Clinton correctional staff, to travel over forty miles from Clinton to Upstate in order to preside over and conduct a Tier III hearing at a facility in which he does not work.

111.   Throughout his Tier III hearing and in his administrative appeal, Plaintiff Emerenciano explained that he made no threats at this meeting, and that he instead had simply raised and sought to discuss the new yard policy and the significant and concerning level of discontent the policy had engendered among the prison population, including those in his block and whom he represented on the ILC.

112.   Five inmate witnesses agreed to testify on Plaintiff Emerenciano's behalf at his Tier III hearing, all of whom were fellow ILC members that were present at the ILC meeting on October 2, 2015.

113.   One of the ILC member witnesses testified at the hearing, in sum and substance, "Being a part of the ILC, we discuss things we try to prevent, so we talk about things that happen. We're trying to alleviate those threats."

114.   All five ILC witnesses testified similarly: They stated that the conversation at the ILC meeting regarding the new yard policy was civil, and that Plaintiff Emerenciano's block had recently been adversely affected by this new policy.

115.   All five ILC witnesses testified and confirmed that no threats, demonstrations, or attempts to incite any demonstration or riot occurred at any time during the meeting.

116.   Another ILC member witnesses stated that Plaintiff Emerenciano brought up the policy because, "sooner or later, one guy is going to stand up, and cause a chain reaction, and we just want to resolve it before something happens."

117.    Yet another ILC member witness echoed these same sentiments, "[Emerenciano] was doing his job, he was conveying what the inmate population was telling him […] It's our job to bring [conflicts] to you all [the facility administration]."

118.    When the ILC member witnesses were questioned at the disciplinary hearing as to whether Plaintiff Emerenciano referenced anything about "83" during that meeting, all five ILC witnesses expressed confusion over what "83" referred to, and stated that no one ever mentioned "83."

119.    All five ILC witnesses further testified that the supervising sergeant of the Clinton yard, Sergeant Hutti, was also present for this conversation about the concerns over the new yard policy that was the subject of the misbehavior report.

120.    Several ILC witnesses testified that Sergeant Hutti informed them at the meeting that they would need to take their concerns over the new yard policy to Defendant DSS Bell, whom Sergeant Hutti advised them was responsible for implementing the new policy at issue.

121.    Sergeant Hutti also testified at the hearing that the conversation he remembered that day included a discussion of problems with the new yard policy and that that there were neither threats nor demonstrations made at the hearing nor any threats of riots or demonstrations. He also testified that "83" was not mentioned.

122.    Sergeant Hutti further testified that the alleged threatening statements and actions by Plaintiff were alleged to have taken place before his arrival at the ILC meeting, but that he was not informed of the alleged misconduct until much later that morning, after the misbehavior report had been issued by Defendant RPL Kowalowski.

21

123.    At the disciplinary hearing, Defendant DSS Bell refused to allow Plaintiff Emerenciano to ask or submit any questions to Sergeant Hutti or Defendant RPL Kowalowski as to why Defendant RPL Kowalowski had not alerted security staff immediately if, in fact, threats had been made or  riotous behavior engaged in.

124.    Defendant RPL Kowalowski testified that the misbehavior report was issued because Plaintiff Emerenciano, "mentioned when inmates sat down in the yard, *someone* was going to stand up instead of sitting on the ground," (emphasis added).

125.    Defendant RPL Kowalowski provided no testimony that Plaintiff Emerenciano in any way made statements about himself standing up in the yard or even threatening to stand up in the yard, or urging or threatening to urge others to stand up in the yard, or otherwise engaging in any demonstrative or riotous behavior.

126.    Plaintiff Emerenciano maintained at the disciplinary hearing that he never made any statements about threatening, urging or otherwise or causing or threatening to cause any riot or demonstration, but instead that all he ever did was simply relay concerns about the new yard policy from his block as an ILC member.

127.    On October 8, 2015, Defendant DSS Bell found Plaintiff Emerenciano guilty of both charges in the misbehavior report and imposed a penalty of 270 days confinement to the Special Housing Unit ("SHU"), along with 270 days loss of packages, commissary, and phone privileges.

128.    Plaintiff Emerenciano timely submitted an administrative appeal to the Commissioner's office on or around October 12, 2015.

129.    Plaintiff Emerenciano's appeal detailed to Defendant Venettozzi the due process violations which occurred at the disciplinary hearing and the retaliatory nature of the misbehavior report.

130.    On November 30, 2015, Defendant Venettozzi responded to Plaintiff Emerenciano's appeal by affirming the disposition and modifying the sanctions to 180 days SHU, with 90 days suspended.

131.    Plaintiff Emerenciano's counsel filed an Article 78 on his behalf challenging the hearing disposition on March 25, 2016.

132.    The disciplinary hearing was administratively reversed by Defendant Venettozzi on April 29, 2016, after Plaintiff Emerenciano had already served all of his SHU time.

133.    The Article 78 was dismissed as moot by the Franklin County Supreme Court on July 14, 2016.

134.    Plaintiff Emerenciano spent until March 3, 2016, or approximately 150 days, in SHU without access to phones, packages, or commissary.

135.    Plaintiff Emerenciano lost his position on the ILC, and lost wages from his assignment in the tailor shop as a result of this retaliatory misbehavior report.

136.    Defendants Annucci, Superintendent Kirkpatrick, RPL Kowalowski, DSS Bell, and Venettozzi took adverse action against, or failed to intervene or mitigate such actions against Plaintiff Emerenciano for engaging in constitutionally protected conduct.

137.    Defendants DSS Bell and Venettozzi violated Plaintiff Emerenciano's due process rights, as there was no evidence to support the disciplinary charges.

23

138.    Plaintiff Emerenciano exhausted his administrative remedies, however he is no longer incarcerated.


**Facts Relevant to Plaintiff Scott**

139.    Plaintiff Scott was a housed in the A-Block at Clinton, formerly known as the "honor block," from approximately 2012 until the events described herein.

140.    Plaintiff Scott was elected to the Clinton Main ILC in February 2015 and was serving his second term representing prisoners from the A-Block.

141.    Plaintiff Scott worked at Clinton as a trainer for the Aggression Replacement Training program and in Transitional Services, a program designed for orientation to prison, for approximately five years.

142.    Plaintiff Scott was one of eleven ILC members who authored the letter to Defendant Annucci on July 12, 2015 ( "July 2015 ILC Letter") shortly after the apprehension of the escapees.

143.    Plaintiff Scott repeats and realleges ¶¶ 36 – 39 and ¶¶ 88 – 91 regarding the contents of the July 2015 ILC Letter, as Plaintiff Scott was also involved in the drafting and delivery of that letter.

144.    Plaintiff Scott also contacted the New York Times in June and July 2015, regarding increased staff assaults on prisoners after the prison escape and discontent among the prisoner population, and also sent letters to legal advocacy organizations during this time.

145.    On July 21, 2017, Plaintiff Scott met with an attorney from Prisoners' Legal Services of New York.

146.     Directly after leaving the legal visit, Plaintiff Scott was informed that he received a "letter in a box" which had been ordered to be destroyed by Defendant Captain Holdridge.

147.     Plaintiff Scott was not informed of who the letter was from, or of its contents.

148.     Upon information and belief, the letter was from a New York Times reporter who wanted to meet with Plaintiff Scott regarding incidents occurring at Clinton after the escape.

149.     Mailroom personnel informed Plaintiff Scott that he was not allowed to return the letter back to the sender, send it to a family member, have a visitor retrieve it, or otherwise dispose of it as per his choosing according to Directive 4422.

150.     According to DOCCS Directive 4422 "Offender Correspondence Program," unauthorized items, "Shall be either returned to the sender at the expense of the offender, or otherwise disposed of. Such will be the choice of the offender and accomplished at the offender's expense."

151.     Plaintiff Scott was instead ordered to sign an "Authorization for Disposal of Personal Property" Form 2068, on which an unknown mailroom staff member wrote, "Security issues per Capt. Holderidge [sic]. <u>DO NOT</u> let inmate read the letter, just dispose of," (emphasis in original).

152.     Plaintiff Scott requested to speak to a Sergeant before signing Form 2068 to dispose of the letter, but was not allowed to do so.

153.     Because he was not allowed to speak to a Sergeant and was ordered to sign Form 2068, Plaintiff Scott felt compelled to do so, and signed against his wishes.

154.     Upon information and belief, there was nothing "unauthorized" in the letter, simply a request for more information regarding alleged recent incidents at Clinton.

155.     Plaintiff Scott filed a grievance on this matter on July 27, 2015.

156.     Plaintiff Scott filed an Inmate Claim Form on August 22, 2015 for the improper disposal of this letter, which was denied on September 16, 2015 because, "Security investigation determined the claimant was not allowed to receive the item due to concerns with facility safety and security."

157.     In August 2015, New York Assemblyman Daniel O'Donnell and Prisoners' Legal Services Executive Director Karen Murtagh met with the Clinton ILC, including Plaintiff Scott, regarding the July 2015 ILC Letter.

158.     Plaintiff Scott also met and spoke with representatives of the Correctional Association of New York when they visited the prison in August 2015.

159.     Upon information and belief, Defendants Annucci and Kirkpatrick were aware of these meetings and the concerns regarding living conditions and retaliation expressed by ILC members.

160.     In August 2015, Plaintiff Scott submitted a grievance regarding the increase in prices in certain commissary items without the issue first being presented to the ILC for possible affordable alternatives.

161.     This grievance complained that the ILC was being circumvented on this commissary item issue by Defendant RPL Kowalowski.

162.     On August 26, 2015, Plaintiff Scott filed a grievance asking for the reinstatement of the Honor Block at Clinton because there had been no published order regarding its termination. The Inmate Grievance Resolution Committee inmate members found in Plaintiff Scott's favor.

26

163.    On September 4, 2015, the New York Times reporter attempted to send Plaintiff Scott another letter. This letter had tracking confirmation supplied by UPS Ground and showed that the letter arrived at Clinton on September 8, 2015.

164.    Plaintiff Scott was never informed of the arrival of this letter, nor was any documentation ever provided to Plaintiff Scott about what happened to this letter.

165.    Upon information and belief, Karen Crowley, Office Assistant II - Mailroom, a mailroom employee or supervisor destroyed the letter or ordered its destruction on or around September 8, 2015.

166.    Plaintiff Scott was not alerted to the fact that another letter had been censored and destroyed by Defendant Crowley until months later.

167.    At an ILC meeting in September 2015, security staff informed ILC representatives, including Plaintiff Scott, that a new yard policy was in effect and that any prisoners "loitering" in the yard would be shot.

168.    Even after Plaintiff Scott and other ILC representatives expressed disbelief at this policy, they were informed to relay this information by security staff back to their blocks.

169.    Prisoners in A-Block began to write grievances regarding this new yard policy which called for the shooting of prisoners "loitering" in the yard.

170.    Defendant Christine Gregory, the Inmate Grievance Resolution Committee ("IGRC") Supervisor told Plaintiff Scott, in sum and substance, that he would be written up for starting a riot because there were so many grievances submitted by inmates upset about the new yard policy.

27

171.    Such statements were intended to curtail Plaintiff Scott's use of the grievance system and to deter him from his duties as an ILC member.

172.    Upon information and belief, Defendant Gregory was aware of Plaintiff Scott's previously filed grievances, including the mishandling of the July letter from the New York Times.

173.    Plaintiff Scott wrote a letter on September 22, 2015 to Defendant Superintendent Kirkpatrick and Defendant Annucci regarding the threats of a misbehavior report by Defendant Gregory (the IGRC Supervisor) and the ILC's attempt to "compromise with the administration to put this place back together after the unfortunate June 6, 2015 event."

174.    This letter was also copied to several politicians, including Assemblyman Daniel O'Donnell, the Department of Justice, New York State Attorney General, Governor Cuomo, as well as several legal advocacy groups.

175.    Plaintiff Scott also filed a grievance on September 26, 2015 following a pat frisk by three correctional officers while leaving the messhall, who attempted to push him down stairs before forcefully escorting him back to the A-Block, while issuing threats of physical harm.

176.    Plaintiff Scott was abruptly to Green Haven Correctional Facility on or around October 27, 2015.

177.    Upon information and belief, Defendant Richard Houck ordered or effectuated this unscheduled transfer in order to remove Plaintiff from Clinton.

178.    Plaintiff Scott was eligible for a "preference transfer" to a DOCCS Hub of his request, due to his good disciplinary history, length of incarceration, and years spent at Clinton.

28

179. Plaintiff Scott was not finished with his term as ILC representative, nor was he transferred to a DOCCS Hub of his preference.

180. Plaintiff Scott lost his position on the ILC, wages, and lost the opportunity to transfer to a hub of his preference.

181. Defendants Annucci, Superintendent Kirkpatrick, Captain Holdridge, Office Assistant – Mailroom Crowley, IGRC Supervisor Gregory, and Correction Analyst Houck, took adverse action against, or failed to intervene or mitigate such actions against Plaintiff Scott for engaging in constitutionally protected conduct.

182. Plaintiff Scott has exhausted his administrative remedies.


## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF

**(Against Defendants KIRKPATRICK, DIXON, ROCK, BELL, KOWALOWSKI, HOLDRIDGE, –CROWLEY, GREGORY, AND HOUCK)**

183. By their actions as described and alleged herein, in retaliating against ALL PLAINTIFFS and/or conspiring in and furthering such retaliation for their protected grievance-related activities, ILC-related activities, and other protected First Amendment activities, defendants violated ALL PLAINTIFFS' First and Fourteenth Amendment rights under the United States Constitution.

### SECOND CLAIM FOR RELIEF

**(Against Defendants ANNUCCI, KIRKPATRICK, VENETTOZZI and KOWALOWSKI)**

184. By their actions as described and alleged herein, in failing to intervene, stop, and/or mitigate the harm suffered by ALL PLAINTIFFS and properly supervise the ILC to

prevent inmates in general and ALL PLAINTIFFS from being retaliated against for utilizing the grievance process and for actions taken while serving as an ILC representative, and failing to otherwise remedy such wrongs despite his having been placed on notice of such practices, wrongs, and unconstitutional acts and violations by earlier reports, appeals, and other sources of information, defendants ANNUCCI, KIRKPATRICK, VENETTOZZI, and KOWALOWSKI evinced deliberate indifference towards and authorization and ratification of the retaliatory adverse actions against ALL PLAINTIFFS, thereby violating their First and Fourteenth Amendment rights under the United States Constitution.

## THIRD CLAIM FOR RELIEF

**(Against Defendants ROCK and BELL)**

185.    By their actions as described and alleged herein, in conspiring with the other Clinton defendants and serving as biased hearing officers by dishonestly suppressing evidence of PLAINTIFF DEJESUS and PLAINTIFF EMERENCIANO's innocence of the misbehavior report charges and evidence in support of plaintiffs' defenses that they were retaliated against for their grievance related activities, and for finding plaintiffs guilty without even some evidence of what they were charged with, DEFENDANTS ROCK and BELL violated PLAINTIFF DEJESUS and PLAINTIFF EMERENCIANO's Fourteenth Amendment due process rights under the United States Constitution.

## FOURTH CLAIM FOR RELIEF

**(Against Defendant VENETTOZZI)**

186.     By his actions as described and alleged herein, in upholding, affirming and modifying DEFENDANTS ROCK and BELL's Superintendent's Tier III Hearing dispositions despite his having been placed on notice of such unconstitutional acts and violations by earlier reports, appeals, and other sources of information, DEFENDANT VENETTOZZI violated PLAINTIFF DEJESUS and PLAINTIFF EMERENCIANO's Fourteenth Amendment due process rights under the United States Constitution.

## FIFTH CLAIM FOR RELIEF

**(Against Defendants HOLDRIDGE and CROWLEY)**

187.     By their actions as described and alleged herein, for the destruction of PLAINTIFF SCOTT'S property, resulting in the censorship of correspondence, and the chilling effect on communication and the right to speak with the media, DEFENDANTS HOLDRIDGE and CROWLEY, violated PLAINTIFF SCOTT's First and Fourteenth Amendment free speech and due process rights under the United States Constitution.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff requests that this court:

1.     declare that the acts set forth herein by defendants are in violation of plaintiffs' rights under the Constitution and laws of the United States;

2.     issue injunctive relief ordering defendants and all those who have care and custody of plaintiffs' records, to expunge all entries of said superintendents' hearings and resulting dispositions from

plaintiffs' records, including but not limited to institutional, departmental and parole records, and to further retrieve from any person, office, agency, or department to whom records referring to such penalties may have been provided;

3.    issue injunctive relief ordering defendant Annucci to amend DOCCS Directive 4002 "Inmate Liaison Committee" to include affirmative protections against retaliatory actions for protected conduct;

4.    enter judgment in favor of plaintiffs for reasonable actual and compensatory, including consequential, damages against each of the defendants, jointly and severally, to compensate plaintiffs for the violation of their rights and for all consequences thereof, including but not limited to the loss of liberty and economic loss by placement in punitive segregation, their removal from the Inmate Liaison Committee, and all other difficulties, suffering, and other hardships arising from defendants' retaliatory actions and deliberate indifference to their constitutional rights to be free from such retaliation;

4.    enter judgment for plaintiffs for reasonable punitive damages against each of the defendants;

5.    award plaintiff the costs of this action, including reasonable attorneys fees;

6.     retain jurisdiction of this case until defendants have fully complied with the orders of this Court; and

7.     grant such other and further relief as this court deems just and proper.

DATED:          September 13, 2018

By:     _s/ Alissa R. Hull_____
ALISSA R. HULL, Bar Number: 519626
Attorney for Plaintiffs
Prisoners' Legal Services of New York
Karen Murtagh, Esq. Executive Director
114 Prospect Street
Ithaca, NY 14850
Phone (607) 273-2283
Fax (607) 272-9122
ahull@plsny.org

MICHAEL E. CASSIDY, Bar No.: 601118
Attorney for Plaintiffs
Prisoners' Legal Services of New York
Karen Murtagh, Esq. Executive Director
24 Margaret Street, Suite 9
Plattsburgh, New York 12901
Telephone: (518) 561-3088
Fax: (518) 561-3262
mcassidy@plsny.org