UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

YOLANDA KEYES, Administratrix of the Estate of
Francisco DeJesus; HERRON EMERENCIANO;
and RASHAD SCOTT,

                    Plaintiffs,

v.                                          9:18-CV-0372
                                          (GTS/DJS)

ANTHONY ANNUCCI, Acting Commissioner,
New York Dept. of Corrs. and Comm. Supervision;
MICHAEL KIRKPATRICK, Former Superintendent,
Clinton Corr. Facility; DONALD VENETTOZZI,
Director Special Housing and Inmate Discipline;
MICHAEL DIXON, Sergeant; JEFFERY ROCK,
Lieutenant; EARL BELL, Deputy Superintendent of
Security; JERRY KOWALOWSKI, Recreation
Program Leader; DANIEL HOLDRIDGE, Captain;
KAREN CROWLEY, Mailroom Officer; RICHARD
HOUCK, Transfer Coordinator; and CHRISTINE
GREGORY, Inmate Grievance Resolution
Committee Supervisor,

                    Defendants.
_____

APPEARANCES:                             OF COUNSEL:

PRISONERS' LEGAL SERVICES OF NY         ALISSA R. HULL, ESQ.
  Counsel for Plaintiffs
114 Prospect Street
Ithaca, NY 14850
24 Margaret Street, Suite 9                   MICHAEL E. CASSIDY, ESQ.
Plattsburgh, NY 12901

HON. LETITIA A. JAMES                     RYAN L. ABEL, ESQ.
Attorney General for the State of New York
  Counsel for Defendants
The Capitol
Albany, NY 12224

GLENN T. SUDDABY, Chief United States District Judge

<u>**DECISION and ORDER**</u>

Currently before the Court, in this prisoner civil rights action filed by Yolanda Keyes (as administratrix of the estate of Francisco DeJesus), Herron Emerenciano, and Rashad Scott ("Plaintiffs") against Acting Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") Anthony Annucci, Former Clinton Correctional Facility Superintendent Michael Kirkpatrick, Special Housing and Inmate Discipline Director Donald Venettozzi, Sergeant Michael Dixon, Deputy Superintendent of Security Earl Bell, Recreation Program Leader Jerry Kowalowski, Captain Daniel Holdridge, Mailroom Officer Karen Crowley, Transfer Coordinator Richard Houck, and Inmate Grievance Resolution Committee Supervisor Christine Gregory ("Defendants"), is Defendants' motion to dismiss Plaintiffs' Amended Complaint for failure to state a claim upon which relief can be granted. (Dkt. No. 25.) For the reasons set forth below, Defendants' motion is granted in part and denied in part.

I.     **RELEVANT BACKGROUND**

A.     **Plaintiffs' Amended Complaint**

In their Amended Complaint, Plaintiffs assert five claims. (Dkt. No. 17 [Pls.' Am. Compl.].) Generally, Plaintiffs' claims arise from various adverse actions allegedly taken against them at Clinton Correctional Facility in 2015 and 2016 following the well-publicized escape of two inmates (Richard Matt and David Sweat) from the facility's Honor Block, after which Plaintiffs became members of the prisoner-elected Inmate Liaison Committee ("ILC").

First, Plaintiffs claim that Defendants retaliated against them in violation of the First and Fourteenth Amendments. (*Id.* at ¶ 183.) More specifically, Plaintiff DeJesus alleges that

Defendants Dixon and Rock retaliated against him for filing grievances and writing letters about staff misconduct in that Defendant Dixon issued a misbehavior report against him and Defendant Rock acted as the hearing officer on that report and found Plaintiff DeJesus guilty of the alleged misbehavior. (*Id.* at ¶¶ 52-85.) Plaintiff Emerenciano alleges that Defendants Kowalowski and Bell retaliated against him for filing grievances, writing letters about staff misconduct, and speaking up as an ILC representative about prison policies in that Defendant Kowalowski issued a misbehavior report against him and transferred him to another prison facility and Defendant Bell acted as the hearing officer on that report and found Plaintiff Emerenciano guilty of the alleged misbehavior. (*Id.* at ¶¶ 86-138.) Plaintiff Scott alleges that Defendants Crowley, Holdridge, Gregory, and Houck retaliated against him for writing letters about staff misconduct, meeting and corresponding with news organizations and lawyers, and filing grievances in that Defendant Holdridge ordered a piece of incoming mail that he received to be destroyed, Defendant Crowley destroyed or ordered the destruction of a second piece of incoming mail, Defendant Gregory threatened to write Plaintiff up related to his use of the grievance system, and Defendant Houck ordered his transfer to another prison facility. (*Id.* at ¶¶ 139-82.)

Second, Plaintiffs claim that Defendants Annucci, Kirkpatrick, Venettozzi, and Kowalowski are responsible for the alleged constitutional violations committed by the other Defendants under a theory of supervisory liability. (*Id.* at ¶ 184.) More specifically, Plaintiffs argue that these Defendants failed to intervene, stop or mitigate the harm caused, failed to properly supervise their subordinates in order to prevent retaliation, failed to remedy the alleged unconstitutional actions despite having notice of such actions, and displayed deliberate indifference to and/or authorized or ratified the unconstitutional retaliatory actions. (*Id.*)

Third, Plaintiffs DeJesus and Emerenciano claim that Defendants Rock and Bell violated their rights under the Due Process Clause of the Fourteenth Amendment.  (*Id.* at ¶ 185.)  More specifically, Plaintiff DeJesus alleges that Defendant Rock, and Plaintiff Emerenciano alleges that Defendant Bell, conspired with the other Defendants and acted in a biased manner in their capacity as hearing officers by dishonestly suppressing evidence of Plaintiffs' innocence as to the misbehavior charges against them and in finding them guilty of those charges without any evidence to support those findings.  (*Id.*)

Fourth, Plaintiffs DeJesus and Emerenciano claim that Defendant Venettozzi violated their rights under the Due Process Clause of the Fourteenth Amendment by upholding, affirming, or modifying the hearing decisions despite having been placed on notice of unconstitutional acts through earlier reports, appeals, and other sources of information.  (*Id.* at ¶ 186.)

Fifth, Plaintiff Scott claims that Defendants Holdridge and Crowley violated his right to free speech under the First Amendment and his rights under the Due Process Clause of the Fourteenth Amendment by destroying or ordering the destruction of two letters he received, which were allegedly from *New York Times* reporters.  (*Id.* at ¶ 187.)

## B.  Parties' Briefing on Defendants' Motion

### 1.  Defendants' Memorandum of Law

Generally, in their memorandum of law, Defendants assert five arguments.   (Dkt. No. 25, Attach. 1, at 5-28 [Defs.' Mem. of Law].)  First, Defendants argue that Plaintiffs' claims against them in their official capacities are barred by the Eleventh Amendment.  (*Id.* at 5-6.)

Second, Defendants argue that the supervisory liability claims against Defendants Annucci, Venettozzi, and Kirkpatrick should be dismissed.  (*Id.* at 6-13.)  More specifically,

Defendants argue the following: (a) as to Defendant Annucci, Plaintiffs have failed to plead personal involvement because (i) their allegations are based on a single letter from ILC members (including Plaintiffs) to Annucci in July 2015, (ii) other complaints of allegedly unlawful conduct were made by them after that letter was sent, and they have not alleged that Defendant Annucci was made aware of those other complaints, and (iii) Plaintiff Scott has not alleged that Defendant Annucci knew about the alleged tampering with his mail; (b) as to Defendant Kirkpatrick, his receipt of three letters from Plaintiffs about various acts of allegedly unlawful conduct, and a cursory finding that there was no malfeasance as to one of those letters, do not constitute a basis for personal involvement, and a general awareness that meetings were taking place about inmate concerns also does not constitute personal involvement; and (c) as to Defendant Venettozzi, the act of affirming, modifying, or otherwise reviewing the hearing dispositions against Plaintiffs DeJesus and Emerenciano does not constitute personal involvement in the alleged violations underlying the hearing decision, and Plaintiffs have not alleged that Defendant Venettozzi had any opportunity to realistically intervene in the alleged unconstitutional acts or that he showed deliberate indifference by failing to do so.  (*Id.*)

Third, Defendants argue that Plaintiff DeJesus' claims should be dismissed.  (*Id.* at 13-20.)  More specifically, Defendants argue that (a) as to the First Claim, (i) Defendant Dixon's issuance of a misbehavior report is not sufficient to support a claim of retaliation because Plaintiff DeJesus has not alleged facts plausibly suggesting that the report was filed in retaliation for his engaging in constitutionally protected activity, and (ii) the Complaint lacks allegations that Defendant Rock conspired to deprive Plaintiff DeJesus of his constitutional rights, including a lack of allegations related to an agreement or overt act; (b) as to the Second Claim, Plaintiff

DeJesus has not made any allegations against Defendant Kowalowski; and (c) as to the Third

Claim, Plaintiff DeJesus has not plausibly stated a liberty interest given that he has alleged that

he was confined to keeplock for only 60 days under conditions that were not unusually harsh.

(*Id.*)

Fourth, Defendants argue that Plaintiff Emerenciano's claims should be dismissed. (*Id.* at

20-23.) More specifically, Defendants argue that (a) as to the First Claim, Plaintiff

Emerenciano's allegations of retaliation are conclusory and do not plausibly suggest a causal

connection between the alleged protected activity and the alleged adverse action, the misbehavior

report and lack of evidence at the related hearing do not plausibly suggest a claim of retaliation,

and he has not included any factual allegations about the conditions of his confinement in SHU

that would plausibly suggest that those conditions were atypical; (b) as to the Second Claim,

Plaintiff Emerenciano does not allege what constitutional harm Defendant Kowalowski had the

opportunity to prevent; and (c) as to the Third Claim, Plaintiff Emerenciano's allegations are

deficient for the same reasons that the allegations of Plaintiff DeJesus are deficient (as discussed

above). (*Id.*)

Fifth, Defendants argue that Plaintiff Scott's claims should be dismissed. (*Id.* at 23-28.)

More specifically, Defendants argue that (a) as to the First Claim, Plaintiff Scott has (i) failed to

plead that Defendant Holdridge's alleged censorship of his mail was motivated by Plaintiff

Scott's engagement in protected activities, (ii) failed to allege that Defendant Crowley was

motivated by Plaintiff Scott's engagement in protected activities or that she was even aware of

his prior conduct, (iii) failed to allege that Defendant Houck's alleged decision to transfer

Plaintiff Scott to a different facility was based in retaliation, and (iv) failed to allege sufficient

facts to plausibly suggest that Defendant Gregory's mere threat to write Plaintiff Scott up constitutes an adverse action; and (b) as to the Fifth Claim, (i) mail from members of the media is not privileged and Plaintiff Scott had alternative methods of petitioning for the redress of his grievances including meetings with various officials, (ii) the destruction of two letters is not sufficient to sustain Plaintiff Scott's claim, particularly where (as here) each incident involved different individuals, and (iii) whether Defendants' actions in destroying Plaintiff Scott's mail violated DOCCS policy is not a relevant factor for determining whether those actions violated Plaintiff Scott's rights under Section 1983.  (*Id.*)

### 2.      Plaintiffs' Opposition Memorandum of Law

Generally, in opposition to Defendants' memorandum of law, Plaintiffs make seven arguments.  (Dkt. No. 33, at 13-42 [Pls.' Opp'n Mem. of Law].)  First, Plaintiffs argue that they have sufficiently stated claims for First Amendment retaliation.  (*Id.* at 15-23.)  More specifically, Plaintiffs argue as follows: (a) Plaintiff DeJesus has asserted plausible claims against Defendants Dixon, Rock, and Kirkpatrick because (i) Defendant Dixon's statements in the relevant misbehavior report show a direct improper motivation for that report given that the report would not have been issued in the absence of Plaintiff DeJesus' protected activity of sending a letter outlining unlawful behavior, (ii) Defendant Rock upheld the misbehavior report and essentially found him guilty of writing a complaint letter, and (iii) Defendant Kirkpatrick's office received and opened the same letter underlying the misbehavior report, which, along with Plaintiff DeJesus' involvement in ILC and the fact he was contacting outside agencies with complaints of treatment at the prison, allows a plausible inference that Defendant Kirkpatrick directed or ordered the issuance of the misbehavior report; (b) Plaintiff Emerenciano has asserted

plausible claims against Defendants Kowalowski and Bell based on his allegations that Defendant Kowalowski issued a misbehavior report against him in response to his filing a grievance against Defendant Kowalowski, and that Defendant Bell upheld that misbehavior report at the disciplinary hearing in response to Plaintiff Emerenciano's criticism of the new yard policy Defendant Bell had developed, as well based on his allegations that he is a member of the ILC; and (c) Plaintiff Scott has asserted plausible claims against Defendants Holdridge, Crowley, Gregory, and Houck because (i) as to Defendants Holdridge and Crowley, Plaintiff Scott filed a grievance related to Defendant Holdridge's destruction of the first letter, and two incidents of mail destruction permit an inference of retaliation, (ii) as to Defendant Gregory, Plaintiff Scott has plausibly alleged that her threat to file a misbehavior report was intended to curtail his ILC activities and filing of grievances, and (iii) as to Defendant Houck, he has plausibly alleged that he was transferred by Defendant Houck to a different facility to curtail his ILC activities, and that there is a close temporal proximity between the transfer and his previous protected activities. (*Id.*)

Second, Plaintiffs argue that they have sufficiently stated claims for supervisory liability against Defendants Annucci, Kirkpatrick, Venettozzi, and Kowalowski. (*Id.* at 23-30.) More specifically, Plaintiffs argue the following: (a) all the supervisory Defendants should be deemed to have knowledge sufficient to impute liability based on the unique circumstances surrounding the 2015 prison escape, which highlighted the systemic and widespread abuses occurring at Clinton Correctional Facility; (b) Defendant Annucci was on notice of the alleged violations based on the July 2015 letter sent to him as well the fact that meetings were occurring with other prison supervisors, and he was aware of a pattern of problematic behavior by his staff but acted

with gross negligence or deliberate indifference in failing to investigate or take remedial steps;

(c) Defendant Kirkpatrick was aware of the allegations of misconduct following the 2015 escape, ILC meetings about staff misconduct, the July 2015 letter to Defendant Annucci, and news articles about perceived staff misconduct, and was also aware of the alleged conduct because he was the highest level of appeal for prison grievances; (d) Defendant Venettozzi was aware of the alleged violations because he reviewed disciplinary hearings; and (e) Defendant Kowalowski authored the misbehavior report against Plaintiff Emerenciano and was present at the ILC meetings where all the Plaintiffs aired their grievances about staff misconduct. (*Id.*)

Third, Plaintiffs make more specific arguments about how the supervisory Defendants are liable. (*Id.* at 31-35.) More specifically, Plaintiffs argue as follows: (a) Plaintiff DeJesus argues that (i) Defendant Kirkpatrick received letters from Plaintiff DeJesus containing complaints and grievances, and there was a temporal proximity between his receipt of those letters and the issuance of the misbehavior report, and (ii) Defendant Venettozzi did more than just rubber-stamp the hearing outcome on the misbehavior report because he considered two letters of appeal and two other letters from Plaintiff DeJesus' counsel about the retaliatory nature of the hearing, and therefore there is a reasonable inference of deliberate indifference in Defendant Venettozzi's refusal to more adequately review the hearing decision or properly supervise staff; (b) Plaintiff Emerenciano argues that (i) Defendant Kirkpatrick participated in ILC meetings, was aware of the ILC members and their complaints, and would have been informed as to why an ILC member would be transferred to a different facility, (ii) Defendant Kowalowski directly issued the misbehavior report against Plaintiff Emerenciano in retaliation for ILC activity, and (iii) Defendant Venettozzi was grossly negligent or deliberately indifferent in affirming the hearing

decision, and the fact that he modified the hearing penalty shows that he did not merely rubber-stamp that decision; and (c) Plaintiff Scott argues that Defendant Kirkpatrick knew he was a member of the ILC and had received multiple grievances regarding instances of retaliation that were not remedied.  (*Id.*)

Fourth, Plaintiffs argue that Plaintiffs DeJesus and Emerenciano have pled a cognizable liberty interest for purposes of a Fourteenth Amendment claim by alleging facts plausibly suggesting that they were subjected to atypical and significant hardships during confinement in keeplock or SHU.  (*Id.* at 36-39.)  More specifically, they argue that (a) Plaintiff DeJesus was confined in keeplock for 60 days, deprived of property, unable to purchase items from the commissary, use the telephone, or have more than one hourly daily of recreation, lost eligibility for merit time and early merit release parole (which resulted in four extra months in prison), and was removed from his position with ILC, and (b) Plaintiff Emerenciano was confined in a SHU facility for 180 days, deprived of property, was unable to purchase commissary items, use the telephone, or have more than one hour daily of recreation, and was removed from his position with the ILC.  (*Id.*)  Plaintiffs also argue that they were deprived of their due process right to a finding of guilt supported by reliable evidence.  (*Id.*)

Fifth, Plaintiffs DeJesus and Emerenciano argue that Defendant Venettozzi violated their due process rights by affirming the hearing decisions for many of the same reasons they previously discussed in connection with their supervisory liability claims.  (*Id.* at 39-40.)

Sixth, Plaintiffs argue that they have alleged facts plausibly suggesting that the relevant Defendants acted with an improper motive in destroying Plaintiff Scott's mail and that he was not provided with due process before it was destroyed.  (*Id.* at 40-41.)

Seventh, Plaintiffs argue that the Eleventh Amendment does not merit dismissal of the entirety of their claims against Defendants in their official capacities because it does not bar Plaintiffs' claims based on injunctive or declaratory relief. (*Id.* at 41-42.)

### 3. Defendants' Reply Memorandum of Law

Generally, in reply to Plaintiffs' opposition memorandum of law, Defendants assert six arguments. (Dkt. No. 39, at 4-11 [Defs.' Reply Mem. of Law].) First, Defendants argue that the claims against the supervisory Defendants should be dismissed. (*Id.* at 4-6.) More specifically, Defendants argue as follows: (a) as to Defendant Annucci, Plaintiffs' allegations of a general awareness of staff malfeasance and pattern of staff behavior is not sufficient to plausibly suggest that he should have known of the specific acts of wrongdoing alleged here, and broad supervisory authority is not a sufficient basis on which to impose liability; (b) as to Defendant Kirkpatrick, a general awareness of a "pervasive pattern of staff misconduct" through reviewing inmate grievances is not sufficient, and Plaintiffs have made no allegations of knowledge of similar wrongdoings by the specific Defendants or subordinates in the past; and (c) as to Defendant Venettozzi, Plaintiffs have not pled any facts other than their own suspicions as to retaliatory motive for affirming hearing decisions. (*Id.*)

Second, Defendants argue that the claims against Defendant Dixon should be dismissed because Plaintiff DeJesus has alleged that the misbehavior report was not based entirely on the letter he wrote to officials, but also on an interview of him in which he stated he would "have problems" with certain corrections officers if they attempted to discipline him for any misconduct, and such statements by Plaintiff DeJesus go beyond his right to file grievances. (*Id.* 6-8.)

Third, Defendants argue that the claims against Defendant Rock should be dismissed because Plaintiff DeJesus has not offered any factual allegations supporting a conspiracy or plausibly suggesting that he suppressed evidence or otherwise violated Plaintiff DeJesus' due process rights at the hearing. (*Id.* at 8.)

Fourth, Defendants argue that the claims against Defendant Bell should be dismissed because, as to Plaintiff Emerenciano's retaliation claim, the Complaint fails to allege how Plaintiff Emerenciano was deprived of any liberty interest and fails to allege any procedural defect in the hearing or in having Defendant Bell oversee the hearing at the Upstate Correctional Facility after Plaintiff Emerenciano's transfer. (*Id.* at 8-9.)

Fifth, Defendants argue that the claims against Defendant Kowalowski should be dismissed because the issuance of a misbehavior report is insufficient adverse action to give rise to a retaliation claim in the absence of any allegations of fabrication of his testimony. (*Id.* at 9-10.)

Sixth, and last, Defendants argue that Plaintiff Scott's claim related to destruction of his mail should be dismissed, noting that the Supreme Court case that Plaintiff Scott relies upon to establish due process procedures related to censoring inmate mail has been limited to outgoing correspondences only and thus does not apply here. (*Id.* at 10-11.)

## II. GOVERNING LEGAL STANDARDS

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp.2d

204, 211 nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J.) (adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, some elaboration regarding that ground is appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212 n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212 n.17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212 n.18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d

13

ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp. 2d at 213 n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 560-61, 577. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 555-70. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 555. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 (internal quotation marks and citations omitted). However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id*., it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S. Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4)

any matter of which the court can take judicial notice for the factual background of the case.[1]

## III.    ANALYSIS

### A.    Whether Plaintiffs' Claims Against Defendants in Their Official Capacities Are Barred by the Doctrine of Sovereign Immunity

After careful consideration, the Court answers this question in the affirmative to the

extent Plaintiffs request monetary relief, but in the negative to the extent Plaintiffs request

declaratory or injunctive relief.

"[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment

bars a damages action against a State [or a State official sued in their official capacity] in federal

---

[1]    *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, No. 10-573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. . . . Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint. . . . However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.  It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

court." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). "Under the doctrine in *Ex Parte Young*, 'a plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers . . . in their official capacities, provided his complaint (a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective.'" *Clark v. DiNapoli*, 510 F. App'x 49, 51 (2d Cir. 2013) (quoting *In re Deposit Ins. Agency*, 482 F.3d 612, 618 [2d Cir. 2007]). However, "[a] plaintiff may not use this doctrine to adjudicate the legality of past conduct," meaning there must be some "plausible threat of future violations." *Clark*, 510 F. App'x at 51 (citing *Papasan v. Allain*, 478 U.S. 265, 27-78 [1986]); *see W. Mohegan Tribe and Nation*, 395 F.3d at 21 (noting that, "in determining whether the *Ex Parte Young* doctrine applies to avoid an Eleventh Amendment bar to suit, 'a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective'"); *see also New York State Corr. Officers & Police Benev. Ass., Inc. v. New York*, 911 F. Supp. 2d 111, 129 (N.D.N.Y. 2012) (D'Agostino, J.) ("[D]eclaratory relief is not permitted under *Ex Parte Young*, when it would serve to declare only past actions in violation of federal law: retroactive declaratory relief cannot be properly characterized as prospective.").

The relevant non-monetary relief requested by Plaintiffs in the Amended Complaint includes (a) a declaration that the alleged acts are in violation of their rights under federal law, (b) injunctive relief ordering the defendants and custodians of records to expunge all entries of the disciplinary hearings and dispositions from Plaintiffs' records, and (c) injunctive relief ordering Defendant Annucci to amend DOCCS Directive 4002 to include affirmative protections for ILC members against retaliatory actions for protected conduct. (Dkt. No. 17, at 31-32 [Pls.'

17

Am. Compl.].)

The Court notes that Defendants have not responded to Plaintiffs' arguments that the requested declaratory and injunctive relief is not barred under the Eleventh Amendment, despite filing a reply memorandum of law in which they responded to other arguments raised in Plaintiffs' opposition memorandum of law. However, even if Defendants had responded in opposition to those arguments, the legal authority and the requests present in Plaintiffs' Amended Complaint indicate that not all of Plaintiffs' bases for relief would be barred by the Eleventh Amendment.

Plaintiffs' first basis for non-monetary relief remains under the purview of the Eleventh Amendment because it does nothing more than ask for a declaration that their rights were violated as the result of past conduct, and is thus not prospective. *See New York State Corr. Officers & Police Benev. Ass., Inc.*, 911 F. Supp. 2d at 129 (finding that claims merited dismissal pursuant to the Eleventh Amendment where plaintiffs sought declaratory relief regarding the state defendants' past conduct). Plaintiffs' other two bases for non-monetary relief, however, appear to have some prospective grounding, particularly the request for injunctive relief related to protections for ILC members from retaliation. Consequently, the Court finds that, to the extent Plaintiffs' claims are premised on those prospective bases for relief, any claims against Defendants in their official capacities are not barred by the Eleventh Amendment. However, any claims against them in their official capacities premised on monetary or retroactive declaratory or injunctive relief must be dismissed pursuant to the proper application of the doctrine of sovereign immunity. Additionally, because Plaintiffs have sued Defendants in their individual capacities as well as their official capacities, the claims against them would also survive on that basis. (Dkt.

18

No. 17, at ¶¶ 9-19 [Pls.' Am. Compl.].)

> **B.     Whether Plaintiffs Have Alleged Facts Plausibly Suggesting a Claim for Retaliation Under the First Amendment**

After careful consideration, the Court answers this question largely in the affirmative for the reasons stated in Plaintiffs' opposition memorandum of law.  (Dkt. No. 33, at 15-23 [Pls.' Opp'n Mem. of Law].)  To those reasons, the Court adds the following analysis.

To state a prima facie case of First Amendment retaliation, a prisoner must allege that (1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action.  *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).  "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation."  *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003).  "In order to satisfy the causation requirement, allegations must be 'sufficient to support the inference that the speech played a substantial part in the adverse action."  *Davis*, 320 F.3d at 354.  A number of factors may be considered in determining the existence of a causal connection between a prisoner's protected activity and a prison official's adverse action, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.  *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996); *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002).  With regard to the first factor, "[a] plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time

to the complained-of adverse action." *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 280 (N.D.N.Y. 2018) (Hurd, J.) (citing *Espinal v. Goord*, 558 F.3d 119, 129 [2d Cir. 2001]). Adverse action that is taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003); *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996); *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994).

Plaintiffs have alleged that they engaged in protected activity in the form of filing grievances, writing letters to prison authorities, and participating in ILC activities. (Dkt. No. 17, at ¶ 183 [Pls.' Am. Compl.].) These activities are considered protected activities sufficient to satisfy the first element. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (holding that "retaliation against a prisoner for voicing or filing grievances on behalf of the prison population as a member of an inmate grievance body, such as the ILC, violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments."); *Davis*, 320 F.3d at 352-53 (noting that filing of prison grievances is a protected activity); *Vega v. Artus*, 610 F. Supp. 2d 185, 206 (N.D.N.Y. 2009) (Suddaby, J.) (recognizing that filing grievances is a constitutionally protected activity); *Wheeler v. Goord*, 03-CV-0787, 2005 WL 2180451, at *9 (N.D.N.Y. Aug. 29, 2005) (Peebles, M.J.) ("[P]laintiff's alleged filing of grievances and writing of letters to prison authorities . . . constituted protected activity within the ambit of First Amendment retaliation jurisprudence.").

In terms of adverse actions, filing false misbehavior reports that result in punishment and transfer to a different facility have been found sufficient to constitute adverse actions. *See Cabbagestalk v. Hudson*, 15-CV-0167, 2016 WL 5404233, at *4 (N.D.N.Y. Aug. 29, 2016)

(Hummel, M.J.) ("[A]n inmate's transfer to a different facility does constitute an adverse action if done in retaliation for the inmate's exercise of his or her rights under the First Amendment.") (citing *Smith v. Levine*, 510 F. App'x 17, 21 [2d Cir. 2013]), *adopted by* 2016 WL 5394734 (N.D.N.Y. Sept. 27, 2016) (Sharpe, J.); *Reed v. Doe No. 1*, 11-CV-0250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (Peebles, M.J.) (finding that the "filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *adopted by* 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012) (McAvoy, J.); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 373 (N.D.N.Y. 2010) (Lowe, M.J., Hurd, J.) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action).

### 1.    Plaintiff DeJesus

In the Amended Complaint, Plantiff DeJesus alleges that he made complaints and filed grievances (both in his individual capacity and as an ILC representative) in November and December 2015, as well as wrote letters about the illegal actions of various corrections officers to officials and the State Commission of Correction on January 3, 2016.  (Dkt. No. 17, at ¶¶ 53-60, 62-64 [Pls.' Am. Compl.].)  He additionally alleges that, on January 27, 2016, he was issued a Tier III misbehavior report related to statements made in his January 2016 letter and, as a result, was sentenced on February 12, 2016, to a period in keeplock confinement.  (*Id.* at ¶¶ 66-69.)  As indicated earlier, these allegations suffice to plausibly suggest both protected activity and an adverse action.

Turning to the third element of a retaliation claim, Plaintiff DeJesus has alleged facts plausibly suggesting that there was a causal connection between his various complaints and

letters and the misbehavior report that resulted in his confinement in keeplock.  More specifically, the relatively close temporal proximity between when the January 3, 2016, letter was received by Defendant Kirkpatrick's office on January 19, 2016, and when the misbehavior report was issued supports Plaintiff DeJesus' allegation that the two are related.  Plaintiff DeJesus' citation to the wording in the relevant portion of that letter and the content of the misbehavior report plausibly suggest that the relevant Defendants used the content of Plaintiff DeJesus' letter and a subsequent interview of him about those complaints as a basis for the misbehavior report.  (Dkt. No. 17, at ¶¶ 64, 66 [Pls.' Am. Compl.].)  Given that the quoted wording of Plaintiff DeJesus' letter does not substantiate the specific "threat" identified by the relevant Defendants in the misbehavior report (e.g., it does not state that Plaintiff DeJesus would file a civil action in response to "any attempt to discipline him," but rather only if the corrections officers engaged in illegal activities such as inflicting bodily harm on him, destroying his property, and fabricating contraband in his possession), the Court cannot say that Plaintiff DeJesus has failed to allege facts plausibly suggesting that the relevant Defendants inappropriately used his statements in this letter as a basis to institute a false misbehavior report against him.

Consequently, Defendants' motion to dismiss Plaintiff DeJesus' First Amendment retaliation claim is denied.

### 2. Plaintiff Emerenciano

In the Amended Complaint, Plaintiff Emerenciano alleges that, "in the months following the escape," he filed a grievance against Defendant Kowalowski for a failure to call him out for ILC meetings, and that, on October 2, 2015, he raised concerns about a new yard policy on behalf

of prisoners at an ILC meeting. (Dkt. No. 17, at ¶¶ 97-104 [Pls.' Am. Compl.].) He additionally

alleges that Defendant Kowalowski issued a false misbehavior report against him on October 5,

2015, for threats of a prison riot that he supposedly made at the ILC meeting of October 2, 2015

(which he alleges he did not make), and that he was sentenced to a period of confinement in SHU

as a result. (*Id.* at ¶¶ 105, 127.) Again, as indicated earlier, these allegations suffice to plausibly

suggest both protected activity and an adverse action.

Turning to the third element of a retaliation claim, Plaintiff Emerenciano has alleged facts

plausibly suggesting that there was a causal connection between his statements at the ILC

meeting raising the concerns of his fellow prisoners about the new yard policy and the

misbehavior report filed by Defendant Kowalowski. Based on Plaintiff Emerenciano's

allegations, the report was served on him only three days after his statements at the ILC meeting

and was directly based on those statements. Additionally, as with Plaintiff DeJesus' allegations,

the alleged content of the misbehavior report conflicts with what Plaintiff Emerenciano alleges

was the content of his statement, a fact that plausibly suggests that the misbehavior report was

based on a false premise. (*Id.* at ¶¶ 115-17, 121, 124-26.)

Consequently, Defendants' motion to dismiss Plaintiff Emerenciano's First Amendment

retaliation claim is denied.

### 3. Plaintiff Scott

In the Amended Complaint, Plaintiff Scott alleges that he contacted the *New York Times*

and legal advocacy organizations about the prison conditions, including meeting with an attorney

from Prisoners' Legal Services of New York, immediately after which he was informed that a

letter sent to him that he believes to have been from a *New York Times* reporter had been

destroyed by Defendant Holdridge. (Dkt. No. 17, at ¶¶ 144-48 [Pls.' Am. Compl.].) Plaintiff

Scott filed a grievance related to the destruction of this letter in July 2015, met with various

representatives in his capacity as a ILC representative in August 2015, and filed other grievances

in August 2015 related to price increases on commissary items and seeking reinstatement of the

Honor Block. (*Id.* at ¶¶ 155-62.) He additionally alleges that, on September 4, 2015, a *New York

Times* reporter attempted to send him another letter, but that the letter was destroyed by

Defendant Crowley. (*Id.* at ¶¶ 163-66.) Plaintiff Scott also alleges that he and other ILC

representatives began to write grievances about a new yard policy in September 2015, but that he

was told by Defendant Gregory that "he would be written up for starting a riot because there were

so many grievances submitted by inmates upset about the new yard policy." (*Id.* at ¶¶ 167-70.)

Plaintiff Scott alleges that he wrote a letter on September 22, 2015, to Defendants Kirkpatrick

and Annucci regarding Defendant Gregory's threat and filed a grievance on September 26, 2015,

about a pat-frisk and an attempt by corrections officers to push him down stairs; he was

"abruptly" transferred to a different facility in October 27, 2015. (*Id.* at ¶¶ 173-78.)

Without determining whether Plaintiff Scott's contacts with news media and legal

services providers could constitute protected activity, the Court finds that the alleged destruction

of both letters allegedly from *New York Times* reporters does not constitute an adverse action.

*See Rasheen v. Adner*, 356 F. Supp. 3d 222, 243-44 (N.D.N.Y. 2019) (Hurd, J.) (finding an

isolated incident of mail tampering did not constitute an adverse action because plaintiff failed to

allege facts plausibly suggesting that he suffered any injury as a result); *Tafari v. McCarthy*, 714

F. Supp. 2d 317, 347 (N.D.N.Y. 2010) (Hurd, J.) (collecting cases in which claims of mail

tampering did not constitute an adverse action, noting in particular that the plaintiff had alleged

only a single instance of mail interference); *Islam v. Goord*, 05-CV-7502, 2006 WL 2819651, at

\*7 (S.D.N.Y. Sept. 29, 2006) (finding that isolated incidents of tampering with plaintiff's family

and legal mail was not an adverse action because it would not deter an ordinary individual from

exercising his constitutional rights and plaintiff failed to allege he suffered any injury as a result

of the tampering); *cf. Marino v. Watts*, 12-CV-0801, 2014 WL 1794588, at \*6 (N.D.N.Y. May 6,

2014) (Mordue, J.) (noting that, depending on the circumstances, the confiscation of a prisoner's

*legal* mail might qualify as an adverse action).  The Court notes that Plaintiff Scott has alleged

that he believed both of these letters were from reporters with the *New York Times* (and thus not

ostensibly legal mail);[2] he has also failed to allege that he suffered any harm as a result of the

destruction of the letters.  As a result, to the extent Plaintiff Scott bases his First Amendment

retaliation claim on the destruction of the two letters, he has not stated a claim upon which relief

can be granted.

However, Plaintiff Scott has also alleged that he was "abruptly" transferred to a different

facility approximately a month after filing a grievance and writing a letter to Defendants

Kirkpatrick and Annucci.  Plaintiff Scott therefore has alleged facts plausibly suggesting both

---

[2]      *See Mann v. Adams*, 846 F.2d 589, 590-91 (9th Cir. 1988) (holding that mail from
the news media is not legal mail); *Carriere v. Shabazz*, 06-CV-2768, 2008 WL 4243003, at \*4
(S.D. Tex. Sept. 10, 2008) (discussing media mail under the heading of non-legal mail); *Grigsby
v. Horel*, 07-CV-2833, 2008 WL 11422633, at \*2 (N.D. Cal. Apr. 28, 2008) ("[M]ail sent to
prisoners from . . . news media . . . falls within the ambit of 'media mail,' not 'legal mail.'"); *see
also Williams v. Kobayashi*, 18-CV-0336, 2019 WL 97017, at \*7 (D. Haw. Jan. 3, 2019) ("[M]ail
to the news media . . . is not legal mail."); *Means v. Mizell*, 06-CV-4542, 2006 WL 3544857, at
\*6-7 (E.D. La. Nov. 13, 2006) (finding that the plaintiff's letter to a television weather reporter
seeking help with his pending legal case was not legal mail); *Watson v. Cain*, 846 F. Supp. 621,
627 n. 3 (N.D. Ill. 1993) (noting that, with regard to a letter to a television station, the Seventh
Circuit has held that mail from an inmate to the news media is not entitled to special status).

protected activity and an adverse action in this respect.  Additionally, for the purposes of this motion, the temporal proximity between the protected activity and the alleged adverse action is sufficiently close to raise a reasonable inference that there was a causal connection between the two.

Lastly, despite the above, Plaintiff Scott has not alleged an adverse action in the form of Defendant Gregory's threat to write Plaintiff Scott up if he or other inmates continued to file grievances regarding a new yard policy.  (Dkt. No. 17, at ¶¶ 169-71 [Pls.' Am. Compl.].)  In particular, Plaintiff Scott does not allege that Defendant Gregory actually followed through on her threat or otherwise took action against him in furtherance of that threat.  Rather, he alleges that it was Defendant Houck who effectuated his transfer, and he does not allege that Defendant Houck was aware of Defendant Gregory's threat or the history of ILC advocacy or grievance filing related to that threat, and thus Plaintiff Scott has not alleged any causal connection between Defendant Gregory's threat and his transfer to a different facility.  This isolated threat, on its own, without any allegations of retaliatory action connected to it, is not sufficient to plausibly suggest an adverse action.  *See Gill v. Tuttle*, 93 F. App'x 301, 303-04 (2d Cir. 2004) (finding that threats to continue to file misbehavior reports against the plaintiff might constitute an adverse action where the defendant had filed similar misbehavior reports in the past that resulted in disciplinary confinement, which raised a reasonable expectation that future reports would lead to additional disciplinary confinement and thus could deter a reasonable inmate); *Keitt v. New York State Dep't of Corrs. and Cmty. Supervision*, 11-CV-0885, 2017 WL 9471826, at *10 (W.D.N.Y. Jan. 4, 2017) (finding that an isolated threat to file a misbehavior report did not constitute an adverse action where the defendant never carried out that threat); *Moore v. Kwan*,

12-CV-4120, 2016 WL 9022575, at *14 (S.D.N.Y. Mar. 30, 2016) (finding that a threat to issue a

misbehavior report did not qualify as an adverse action); *Wellington v. Langendorf*, 12-CV-1019,

2013 WL 3753978, at *11 (N.D.N.Y. July 15, 2013) (Scullin, J.) (finding no adverse action

where the defendant made a verbal threat, but did not repeat the threat or take any affirmative

action to suggest that she would do anything to act on the threat).

Consequently, Defendants' motion to dismiss Plaintiff Scott's First Amendment

retaliation claim is granted to the extent that the claim is based on the alleged destruction of his

mail by Defendants Holdridge and Crowley and the alleged threat by Defendant Gregory, but

denied to the extent that the claim is based on his alleged transfer to a new facility by Defendant

Houck.

### C. Whether Plaintiffs DeJesus and Emerenciano Have Alleged Facts Plausibly Suggesting a Claim for a Violation of the Due Process Clause of the Fourteenth Amendment

After careful consideration, the Court answers this question in the negative as to Plaintiff

DeJesus' Third Claim under the Fourteenth Amendment for the reasons stated in Defendants'

memoranda of law, but in the affirmative as to Plaintiff Emerenciano's Third Claim under the

Fourteenth Amendment for the reasons stated in Plaintiffs' opposition memorandum of law.

(Dkt. No. 25, Attach. 1 [Defs.' Mem. of Law]; Dkt. No. 33 [Pls.' Opp'n Mem. of Law]; Dkt. No.

39 [Defs.' Reply Mem. of Law].)  To those reasons, the Court adds the following analysis.

To state a due process claim under 42 U.S.C. § 1983 related to a prisoner's restricted

confinement within a prison, the plaintiff must show that (1) he possessed an actual liberty

interest, and (2) he was deprived of that interest without being afforded sufficient process.

*Burroughs*, 325 F. Supp. 3d at 275.

### 1.        Existence of a Liberty Interest

"Prison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*  To constitute an "atypical and significant hardship," "the conditions imposed upon the inmate must be compared with those imposed upon the rest of the population of the facility *as well as those in administrative and protective confinement.*" *Id.* at 276.  The Court should consider both the duration and the conditions of confinement when assessing the severity of the hardship.  *Id.* Generally, confinements in SHU for a period of up to 101 days under normal conditions will generally not constitute an atypical hardship, while confinement for a period of more than 305 days has been considered atypical even under normal conditions.  *Id.* The Second Circuit has indicated that "the ultimate issue of atypicality is one of law." *Sealey v. Giltner*, 187 F.3d 578, 585 (2d Cir. 1999).

Plaintiffs DeJesus and Emerenciano's claims for due process violations are premised on a loss of liberty based on their confinement to keeplock or SHU as a result of the allegedly retaliatory misbehavior reports issued against them.  In particular, Plaintiff DeJesus alleges that he was confined in keeplock for 60 days[3] with loss of package, commissary, phone, and recreation privileges (other than one hour of recreation per day), and with deprivation of access to his personal property; he also alleges incidental effects of his confinement in keeplock, including an inability to complete a programming requirement that prevented him from qualifying for an appearance before the parole board (which in turn resulted in him staying in

---

[3]        His imposed punishment had been 90 days, but he received reductions for good behavior.  (Dkt. No. 17, at ¶ 76 [Pls.' Am. Compl.].)

prison for an additional four months), loss of his ILC position, and loss of a preference transfer to a facility closer to his home.  (Dkt. No. 17, at ¶¶ 69-71, 76-82 [Pls.' Am. Compl.].)  Plaintiff Emerenciano alleges that he was confined in SHU for 150 days[4] with loss of access to phone, package, and commissary privileges; he also alleges incidental effects of his confinement in SHU, including loss of his ILC position and lost wages from his job assignment.  (*Id.* at ¶¶ 130-35.)

The allegations of Plaintiff DeJesus do not plausibly suggest conditions imposing an atypical and significant hardship.  Plaintiff DeJesus' period of keeplock confinement of 60 days is within the range generally not considered atypical, and he has failed to allege any additional abnormal conditions that would make it so.  Rather, the conditions alleged by Plaintiff DeJesus (loss of package, commissary, phone, and recreation privileges, and deprivation of access to his personal property) are for all intents and purposes the normal losses of privileges incident to the confinement of any prisoner in administrative segregation.[5]  Notably, a review of the decisions in this Circuit indicate that such normal loss of privileges is not, by itself, sufficient to constitute atypical conditions.  *See Sealey*, 197 F.3d at 589 (finding that a 101-day confinement in SHU with conditions such as confinement to his cell for 23 hours per day with only one hour for recreation, a limitation to three showers per week, loss of various privileges, more noise than the

_____

[4]    His imposed punishment had been 270 days, but this was reduced on appeal to 180 days with 90 days suspended.  (Dkt. No. 17, at ¶ 130 [Pls.' Am. Compl.].)

[5]    The Second Circuit has noted that, according to regulations for SHU, normal conditions of confinement include (a) solitary confinement in a cell for 23 hours per day, (2) one hour of exercise in the prison yard per day, (c) a limitation to two showers per week, (d) denial of various privileges available to the general population such as work and out-of-cell schooling, (e) limited visitors, and (f) limited number of books.  *Palmer v. Richards*, 364 F.3d 60, 65 n.3 (2d Cir. 2004) (quoting N.Y. Comp. Codes R. & Regs. Title 7, §§ 304.1-.14, 305.1-.6 [2003]).

general population cells, and a few incidents in which other inmates threw feces at him did not meet the required duration and conditions to meet the standard for atypicality); *Spence v. Senkowski*, 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (finding that the 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in the general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord*, *Horne v. Coughlin*, 949 F. Supp. 112, 116-17 (N.D.N.Y. 1996) (Smith, M.J.) (involving 180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population).

The Court is not convinced by Plaintiff DeJesus' argument that the ramifications of his confinement in administrative segregation (including loss of ILC positions, loss of eligibility for early merit release, and loss of preference transfers) are conditions of confinement for the purposes of this liberty interest analysis. The Court notes in particular that Plaintiff DeJesus has not cited any legal authority in which a court has so considered such facts. (Dkt. No. 33, at 36-38 [Pls.' Opp'n Mem. of Law].)

Although this is a motion to dismiss and Plaintiffs therefore have not yet had the opportunity to present evidence of the conditions of their confinement, the Court finds that Plaintiff DeJesus' complete failure to allege any conditions of confinement beyond the norm for keeplock or SHU confinement, coupled with the fact that his confinement was for 60 days, merits a finding that he has not alleged facts plausibly suggesting a liberty interest to support his due process claim. *See Cole v. New York State DOCCS*, 14-CV-0539, 2016 WL 5394752, at *19 (N.D.N.Y. Aug. 25, 2016) (Peebles, M.J.) (noting that, under the guidance of the Second Circuit,

"when the duration of restrictive confinement is less than 101 days, proof of 'conditions more onerous than usual' is required"), *adopted by* 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016) (Sannes, J.).

Defendant Emerenciano's claim is somewhat different in that, although he also alleged facts suggesting normal SHU conditions, his term of confinement of 150 days is in the intermediate range between what the Second Circuit and other courts have found to be either acceptable or not acceptable with normal conditions. Because of the extended nature of the period of confinement, the Court finds that a closer consideration of the conditions of confinement and the circumstances is warranted to determine whether even the mostly normal conditions alleged would be considered to impose an atypical and significant hardship. Therefore, the Court declines to dismiss Plaintiff Emerenciano's due process claim on the basis of the existence of a liberty interest at this stage.

For the above reasons, Defendants' motion to dismiss Plaintiffs' Third Claim is granted as to Plaintiff DeJesus, but denied as to Plaintiff Emerenciano.

## 2. Deprivation of a Liberty Interest

"An inmate also has a due process right to a hearing before he may be deprived of a liberty interest on the basis of a misbehavior report," which requires that there must be "some evidence" to support the sanction imposed in that hearing; this standard is "extremely tolerant and is satisfied if there is any evidence in the record that supports the disciplinary ruling." *Diaz*, 2010 WL 1133074, at *6. Having established that Plaintiff Emerenciano has alleged facts plausibly suggesting that he possesses a liberty interest, the Court must also assess whether he has alleged facts plausibly suggesting that the misbehavior report and subsequent hearing

deprived him of that liberty interest.

Plaintiff Emerenciano alleges, in relevant part, that (a) Defendant Bell presided over his hearing on the misbehavior charges despite being the promulgator of the policy Plaintiff Emerenciano was challenging at the ILC meeting that led to misbehavior report, (b) it was irregular for Defendant Bell, a member of the staff at Clinton Correctional Facility, to preside over a hearing at Upstate Correctional Facility (to which Plaintiff Emerenciano had been transferred), (c) Plaintiff Emerenciano and five witnesses testified on his behalf in a way that contradicted the misbehavior report, (d) Defendant Bell refused to allow anyone to question Sergeant Hutti or Defendant Kowalowski as to why Defendant Kowalowski failed to immediately alert staff if he believed Defendant Emerenciano's statements constituted threats of an impending prisoner riot, and (e) Defendant Kowalowski did not provide any testimony indicating that Plaintiff Emerenciano's statements were actually threatening. (Dkt. No. 17, at ¶¶ 108, 110-26, [Pls.' Am. Compl.].)

Based on these allegations, the Court finds that Plaintiff Emerenciano has alleged facts plausibly suggesting that there was not the minimum amount of evidence required to support the disciplinary ruling against him. Consequently, Defendants' motion to dismiss Plaintiff Emerenciano's Third Claim for a violation of the Fourteenth Amendment due process claim against Defendant Bell is denied.

Because Plaintiffs DeJesus and Emerenciano's Fourth Claim under the Fourteenth Amendment is asserted against Defendant Venettozzi for his actions in supervising the Defendants who conducted the misbehavior report disciplinary hearings, it is discussed below in Part III.E. of this Decision and Order.

32

**D.      Whether Plaintiffs Have Alleged Facts Plausibly Suggesting a Claim for Violation of Plaintiff Scott's Free Speech Rights Under the First Amendment and/or Deprivation of Property Under the Fourteenth Amendment**

After careful consideration, the Court answers this question in the negative for the reasons stated in Defendants' memoranda of law.  (Dkt. No. 25, Attach. 1, at 24-28 [Defs.' Mem. of Law]; Dkt. No. 39, at 10-11 [Defs.' Reply Mem. of Law].)  To those reasons, the Court adds the following analysis.

Prisoners have a limited right to send and receive mail, and legal mail is entitled to greater protection than nonlegal mail.  *Wesolowski v. Washburn*, 615 F. Supp. 2d 126, 129 (W.D.N.Y. 2009) (citing *Johnson v. Goord*, 445 F.3d 532, 534 [2d Cir. 2006]; *Davis v. Goord*, 320 F.3d 346, 351 [2d Cir. 2003]).  "[I]n order to establish a First Amendment claim for interference with incoming, non-legal mail, an inmate must show a pattern and practice of interference that is not justified by any legitimate penological concern."  *Williams v. Lane*, 13-CV-0965, 2016 WL 4275738, at *2 (N.D.N.Y. Aug. 15, 2016) (Sannes, J.).  Interference with in-coming and non-legal mail can generally be justified by a general security interest.  *Cancel v. Goord*, 00-CV-2042, 2001 WL 303713, at *5-6 (S.D.N.Y. Mar. 29, 2001) (citing *Davidson v. Scully*, 694 F.2d 50, 53 [2d Cir. 1982]).

The Court finds that Plaintiff Scott has not alleged facts plausibly suggesting a First Amendment claim based on free speech rights.  The Amended Complaint acknowledges that (a) the incoming letters that Plaintiff Scott alleges were destroyed by the relevant Defendants were from a *New York Times* reporter, and he has made no allegations to even suggest (much less plausibly) that these letters were legal mail, (b) there were only two instances of interference with his mail, and (c) the facility's stated reason for destruction of the first letter was based on security

33

concerns. (Dkt. No. 17, at ¶¶ 148, 151, 156, 163 [Pls.' Am. Compl.].) Generally, two isolated instances of mail tampering do not plausibly suggest a pattern or practice of interference. *See Williams*, 2016 WL 4275738, at *2 (adopting the magistrate judge's findings that *three* alleged incidents of interference with nonlegal mail were insufficient to establish a pattern or practice) (emphasis added); *Cancel*, 2001 WL 303713, at *6 (finding that a single instance of withholding incoming non-legal mail did not establish a pattern or practice of interference, as well as that two instances of opening incoming *legal* mail did not indicate ongoing activity) (emphasis added). Additionally, Plaintiff Scott's own allegations admit that prison officials provided a legitimate penological concern in the form of a general security interest to support the destruction of at least the first letter; and, given that the second letter is alleged to have come from the same or similar source, the Court cannot say that, in the absence of any contrary allegations, that reason would not apply also to the second letter.

Plaintiff Scott also claims that the destruction of his mail violated his due process rights under the Fourteenth Amendment. In particular, Plaintiff argues that *Procunier v. Martinez*, 416 U.S. 396 (1974), imposes certain procedures, including appropriate notice, a reasonable opportunity to challenge the determination, and an ultimate determination by a disinterested party, before a prisoner's mail can be censored. (Dkt. No. 33, at 40-41 [Pls.' Opp'n Mem. of Law].) However, as Defendants argue, *Procunier* was limited to regulations concerning outgoing correspondences by the Supreme Court in *Thornburgh v. Abbott*, 490 U.S. 401 (1989), which found that incoming mail was instead subject to a standard of whether the regulations are reasonably related to legitimate penological interests. *Thornburgh*, 490 U.S. at 404-14. As has already been discussed, Plaintiff Scott has acknowledged through his allegations that the relevant

Defendants explicitly cited security concerns related to the destruction of the first letter, and Plaintiff Scott otherwise offers no factual allegations plausibly suggesting that Defendants' destruction of mail from a reporter was not neutral (i.e., that other inmates were permitted to receive such correspondence). *See Thornburgh*, 490 U.S. at 415 (noting that, where distinctions are drawn between different incoming publications based on their potential security implications, such action is neutral). Consequently, Plaintiff Scott's reliance on *Procunier* is misplaced.

Additionally, neither a negligent nor intentional deprivation of a prisoner's property can be the basis of a constitutional claim if there are sufficient post-deprivation remedies to address the claim. *Burroughs*, 325 F. Supp. 3d at 275 (dismissing Fourteenth Amendment claim related to property loss for failure to state a claim because plaintiff had not alleged that adequate post-deprivation remedies to recover the value of his property were unavailable); *accord, Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996). Here, Plaintiff Scott has not alleged that he lacked any post-deprivation remedy; rather, he acknowledges that he was able to (and did) file a grievance related to the destruction of the first letter. Plaintiff Scott therefore has not alleged facts plausibly suggesting a procedural due process violation.

To the extent Plaintiff Scott asserts a substantive due process claim based on a liberty interest, "to establish a violation of a prisoner's right to the "free flow of incoming and outgoing mail," he must show that "prison officials 'regularly and unjustifiably interfered with the incoming legal mail.'" *Rasheen*, 356 F. Supp. 3d at 234 (quoting *Davis v. Goord*, 320 F.3d 346, 351 [2d Cir. 2003]). This argument must fail for the same reasons as his First Amendment free speech claim failed in that two incidents of mail tampering, one of which was explicitly based on security concerns, do not constitute a regular and unjustified interference with his mail, and the

35

mail in question was not legal mail, but less-protected nonlegal mail.

Lastly, to the extent that Plaintiff Scott argues that Defendants' destruction of his mail violated a DOCCS directive, "a Section 1983 claim brought in federal court is not the appropriate forum to raise violations of prison regulations." *Rasheen*, 356 F. Supp. 3d at 236; *see also Doe v. Conn. Dep't. of Child & Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990); *Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir. 1985).

For all of the above reasons, Plaintiff Scott's Fifth Claim under the First and/or Fourteenth Amendments is dismissed.

### E. Whether Plaintiffs Have Alleged Facts Plausibly Suggesting the Supervisory Liability of Defendants Annucci, Kirkpatrick, and Venettozzi[6]

After careful consideration, the Court answers this question in the negative as to Defendants Annucci and Kirkpatrick for the reasons stated in Defendants' memoranda of law, but in the affirmative as to Defendant Venettozzi for the reasons stated in Plaintiffs' opposition memorandum of law. (Dkt. No. 25, Attach. 1 [Defs.' Mem. of Law]; Dkt. No. 33 [Pls.' Opp'n Mem. of Law]; Dkt. No. 39 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

"[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional

---

[6]     The Court notes that, although Plaintiffs also asserted this claim against Defendant Kowalowski, it is not apparant that Defendant Kowalowski acted in a supervisory capacity. Rather, Plaintiff Emerenciano's allegations against Defendant Kowalowski involve Defendant Kowalowski's own actions in filing a misbehavior report against him without any reference to the involvement of subordinate officers. (Dkt. No. 17, at ¶¶ 95-105 [Pls.' Am. Compl.].) The fact that Defendant Kowalowski supervised the ILC (a group comprised of elected prisoners) does not plausbily suggest he was acting as a supervisor for the purposes of supervisory liability.

deprivation." *Rasheen*, 356 F. Supp. 3d at 233 (quoting *Grullon v. City of New Haven*, 720 F.3d

133, 138 [2d Cir. 2013]). Where the defendants are supervisory officials, "a mere linkage to the

unlawful conduct through the prison chain of command (i.e., under the doctrine of *respondeat*

*superior*) is insufficient to show his or her personal involvement in that unlawful conduct." *Id.*

(citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 [1981]; *Richardson v. Goord*, 347 F.3d 431, 435

[2d Cir. 2003]).

The Second Circuit has previously indicated that supervisory defendants may be

considered personally involved only if they "(1) directly participated in the alleged constitutional

violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3)

created, or allowed to continue, a policy or custom under which the violation occurred, (4) had

been grossly negligent in managing subordinates who caused the violation, or (5) exhibited

deliberate indifference to the rights of inmates by failing to act on information indicating that the

violation was occurring." *Rasheen*, 356 F. Supp. 3d at 233 (citing *Colon v. Coughlin*, 58 F.3d

865, 873 [2d Cir. 1995]). "In addition to satisfying one of these requirements, a plaintiff must

also establish that the supervisor's actions were the proximate cause of the plaintiff's

constitutional deprivation." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014).

The Supreme Court's decision in *Iqbal* has raised the question of whether all of the *Colon*

factors continue to be viable. *Montanez v. City of Syracuse*, 16-CV-0550, 2019 WL 315058, at

*17 (N.D.N.Y. Jan. 23, 2019) (Sannes, J.). Neither the Second Circuit nor the Supreme Court

have made any findings on this issue. Courts within the Second Circuit have taken various

approaches post-*Iqbal*, from finding that only the first and third factors remain viable, to

continuing to apply all factors in the absence of Second Circuit guidance, to considering the

specific constitutional provision underlying the claim and applying all the *Colon* factors to claims that rely on a standard of unreasonable conduct or deliberate indifference but declining to apply all of them where the claim requires instead a showing of discriminatory intent. *See Montanez*, 2019 WL 315058, at *17-18 (collecting cases) (adopting the specific constitutional provision approach and applying all the *Colon* factors to the plaintiff's Fourteenth Amendment claims because they did not require a showing of discriminatory intent); *Carpenter v. Apple*, 15-CV-1269, 2017 WL 3887908, at *9-10 (N.D.N.Y. Sept. 5, 2017) (Suddaby, C.J.) (noting that the majority of district courts have continued to apply all of the *Colon* factors "where the constitutional violation at issue does not require a showing of discriminatory intent" and adopting that majority approach); *Marom v. City of New York*, 2016 WL 916424, at *15 (S.D.N.Y. 2016) (reasoning that *Iqbal* supported the specific constitutional provision approach, and finding that all the *Colon* factors might be viable for false arrest and excessive force claims that were based on a reasonableness standard, but that the second, fourth, and fifth factors would not apply to a First Amendment retaliation claim because such claim contains an intent requirement).

The Court agrees with the specific constitutional provision approach discussed above because it is the most consistent with the guidance provided in *Iqbal*. *See Iqbal*, 556 U.S. at 676 (noting that, "[t]he factors [related to whether a government official's individual actions violated the Constitution] necessary to establish a *Bivens* violation will vary with the constitutional provision at issue," discussing that the First and Fifth Amendments require that the official acted with a discriminatory purpose, and rejecting the argument that supervisors should be held liable on such claims merely because they knew of a subordinate's discriminatory purpose). The Court

will therefore consider all of the *Colon* factors as to Plaintiffs' claims under the Fourteenth Amendment, but will only apply the first and third factors as to Plaintiffs' claims under the First Amendment.

Additionally, the Court is not persuaded that it must follow the direction of cases cited by Plaintiffs in which claims against supervisory personnel were allowed to proceed based on the circumstances following the well-publicized June 2015 prison escape at Clinton Correctional Facility. In particular, U.S. District Judge Mae A. D'Agostino of this District noted in *Coleman v. Cuomo* that the decision to allow those claims to proceed was based not only on the circumstances following the escape, but also on "the allegations and documentary evidence showing potential widespread abuses and similar conduct" within Clinton Correctional Facility. *Coleman v. Cuomo*, 18-CV-0390, 2019 WL 257933, at *4 (N.D.N.Y. Jan. 18, 2019) (D'Agostino, J.). Also notable is the fact that much of the alleged conduct in *Coleman* occurred just days after the prison escape on June 6, 2015, while the events giving rise to the claims in this action occurred in July 2015 or later months. Additionally, *Alexander v. Cuomo* is distinguishable from this case because, in addition to the circumstances of the prison escape, the plaintiff in that case had included factual allegations plausibly suggesting that dozens of other inmates had reported experiences similar to those alleged by the plaintiff, and a report of September 4, 2015, documented similar experiences. *Alexander v. Cuomo*, 17-CV-0309, 2018 WL 2041576 (N.D.N.Y. Feb. 26, 2018) (Sannes, J.). By contrast, Plaintiffs in this case have made general allegations that (1) prisoners made complaints of staff misconduct, (2) a letter was submitted by the ILC in July 2015 related to assaults on prisoners, destruction of property, elimination of incentive programs, restriction of telephone use, destruction of grievances, and

financial impropriety, (3) a meeting was held to discuss that letter, and (4) the *New York Times* and local newspapers reported staff abuse. (Dkt. No. 17, at ¶¶ 33-34, 39-44 [Pls.' Am. Compl.].)

Other than Plaintiff Scott's allegations that his mail was destroyed, none of these alleged complaints involve conduct similar to what Plaintiffs reports experiencing (i.e., the retaliatory imposition of keeplock or SHU detainment and transfer to different facilities for filing grievances or acting in the capacity as an ILC representative). The only allegation specifically related to such similar conduct is Plaintiffs' allegation that the number of ILC members in attendance at meetings fell from 11 on June 3, 2015, to three in April 2016, because, "upon information and belief," Defendants and other DOCCS staff had issued "unwarranted misbehavior reports, unscheduled transfers, and other retaliatory actions" against ILC representatives. (*Id.* at ¶¶ 46-47.) The Court finds that such allegations do not, as a whole, constitute a sufficient basis on which to reasonably infer that Defendants Annucci, Kirkpatrick, and Venettozzi had the requisite knowledge of the abuses relevant to this action by simply virtue of the circumstances surrounding the June 2015 prison escape. The Court will of course consider the totality of the alleged factual circumstances in making its determination, including the environment created in the aftermath of the prison escape; but it declines to afford those circumstances the nearly determinative weight that Plaintiffs appear to be requesting. (Dkt. No. 33, at 25-26 [Pls.' Opp'n Mem. of Law].)

### 1. First Amendment Retaliation Claims

As discussed above, because a retaliation claim under the First Amendment requires a showing of discriminatory intent, supervisory liability will be imposed only if Plaintiffs have alleged in the Amended Complaint that the officials either (a) directly participated in the alleged constitutional violation, or (b) created, or allowed to continue, a policy or custom under which

the violation occurred. As a result, Plaintiffs' arguments related to gross negligence and deliberate indifference are rejected.

In the Amended Complaint, Plaintiffs allege that their Second Claim is based on Defendants Annucci, Kirkpatrick, and Venetozzi's actions in "failing to intervene, stop, and/or mitigate the harm suffered by [Plaintiffs] and properly supervise the ILC to prevent inmates in general and [Plaintiffs] from being retaliated against for utilizing the grievance process and for actions taken while serving as an ILC representative, and failing to otherwise remedy such wrongs despite having been placed on notice of such practices, wrongs, and unconstitutional acts and violation by earlier reports, appeals, and other sources of information." (Dkt. No. 17, at ¶ 184 [Pls.' Am. Compl.].)

As to creating or allowing a policy or custom, Plaintiffs have not alleged facts plausibly suggesting any policy or custom of punishing ILC members for filing grievances or otherwise advocating for prisoners. Plaintiffs allege that the number of ILC members present at ILC meetings dropped from 11 on June 3, 2015, to only three at a meeting in April 2016; and they allege that, "upon information and belief," this decrease was the result of retaliatory actions against ILC members. (Dkt. No. 17, at ¶¶ 46-48 [Pls.' Am. Compl.].) However, even accepting the allegation related to the reduction in numbers as true, as the Court must on a motion to dismiss, Plaintiffs have not asserted any factual allegations to support their bare assertion made on information and belief that this reduction was the product of retaliation for those members' ILC activities (apart from the allegations related to the alleged constitutional violations committed specifically against them as Plaintiffs, which are based on more than just their status as ILC members).

Plaintiff assert generally that eleven ILC members authored a letter to Defendant Annucci on July 12, 2015, in which they (a) requested a meeting outside the presence of employees of Clinton Correctional Facility, and (b) stated concerns about assaults on prisoners, destruction of prisoner property, elimination of incentive programs, the restriction of telephones, destruction of grievances, and financial impropriety with the Inmate Benefit Fund. (Dkt. No. 17, at ¶¶ 36-40 [Pls.' Am. Compl.].) This letter resulted in meetings between ILC members, a New York Assemblyman, the Executive Director of Prisoners' Legal Services, and the Correctional Association of New York; Plaintiffs do not allege that Defendant Annucci participated in these meetings. (*Id.* at ¶¶ 40-41.) Plaintiff DeJesus alleges that he sent a letter to Defendant Kirkpatrick on January 4, 2016, regarding retaliatory actions by two corrections officers (not involved in this action) including verbal harassment, threats of harm and placement in solitary confinement, and theft of prisoners' food for grievances that had been filed in response to their actions in prohibiting the inmates from playing dominoes, as well as a letter of January 3, 2016, to the State Commission of Corrections related to retaliation for those same grievances, which also ended up being sent to Defendant Kirkpatrick. (*Id.* at ¶¶ 58-59, 63-65 [Pls.' Am. Compl.].) Plaintiff Emerenciano alleges that he reported malfeasance by corrections staff in the July 2015 letter and raised issues about staff assaults and abuse of authority in various meetings, filed a grievance on his own behalf against Defendant Kowalowski when he was not called out for ILC meetings on multiple occasions, and opposed a yard policy requiring inmates to sit on the ground for thirty minutes; he alleges that these actions resulted in both his transfer to another facility and a misbehavior report. (*Id.* at ¶¶ 87-93, 100-05.) He also alleges that his appeal of the punishment resulting from the misbehavior report was made to Defendant Venettozzi. (*Id.* at ¶¶

129-30.) Plaintiff Scott alleges that he reported malfeasance by corrections staff in the July 2015 letter, contacted the *New York Times* about staff assaults on prisoners in the wake of the prison escape, sent letters to legal advocacy organizations, met with an attorney from Prisoners' Legal Services of New York, filed grievances related to the destruction of his mail, the increase in the price of commissary items without putting the matter to the ILC, seeking reinstatement of the Honor Block to the prison, and the use of excessive force, and wrote a letter to Defendants Kirkpatrick and Annucci on September 22, 2015, regarding a threat of retaliation against him if he filed grievances related to a new yard policy; he alleges that he was abruptly transferred to another facility in retaliation for these actions. (*Id.* at ¶¶ 142-45, 155-62, 167-76.)

As to Defendant Annucci, the only alleged involvement is that (a) he was the recipient of the July 2015 letter sent by the ILC members and he was aware of both this letter and the resulting meetings (though he did not attend those meetings), (b) he was the recipient of a letter from Plaintiff Scott about being threatened with retaliation over the filing of grievances, and (c) he was the recipient of a letter from Plaintiffs' counsel on or around March 20, 2016, regarding "much of the retaliation described in the complaint." As already discussed above, the July 2015 letter is not alleged to discuss conduct of the same or similar nature as is generally alleged in the Amended Complaint and, as a result, does not plausibly suggest that Defendant Annucci was aware of the alleged policy or custom of retaliation against inmates for ILC involvement. The March 2016 letter alleged to have been sent by Plaintiffs' counsel also does not plausibly suggest that Defendant Annucci was aware of any such policy or custom because Plaintiffs' allegation that the letter discussed "much of the retaliation described in the complaint" is too vague to describe what information about specific incidents that letter supposedly relayed. The remaining

letter from Defendant Scott allegedly described one incident of a threat made against Defendant Scott, which does not plausibly suggest a widespread policy or custom. The Court notes that, as a general matter, "the mere receipt of letters protesting unconstitutional conduct is insufficient to allege personal involvement." *Long v. Crowley*, 09-CV-0456, 2010 WL 5129102, at *1 (W.D.N.Y. Dec. 10, 2010); *see Chambers v. Wright*, 05-CV-9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) (finding that a supervisor's receipt and denial of a grievance was insufficient to establish personal involvement). Additionally, Plaintiffs do not allege that Defendant Annucci actually read these letters or made any attempt to investigate them. *See Bennett v. Columbe*, 16-CV-0653, 2017 WL 6049238, at *4 (N.D.N.Y. Oct. 17, 2017) (Hummel, M.J.) (finding personal involvement had not been adequately pled where the plaintiff did not allege that the letters were sent to the proper address by appropriate means, that the defendant received the letters and read them, or that he personally took action to investigate the letters), *adopted by* 2017 WL 606904 (N.D.N.Y. Dec. 6, 2017) (Sannes, J.). Consequently, the Court finds that Plaintiffs have failed to allege facts plausibly suggesting that Defendant Annucci was personally involved in any First Amendment violation based on direct involvement or allowance of a policy or custom.

As to Defendant Kirkpatrick, Plaintiffs variously allege that they sent him letters outlining incidents of retaliation, that he responded that there was "no evidence of staff malfeasance" as to a grievance about a prohibition of domino games, and that he was present at ILC meetings in which certain issues about physical and verbal abuse by corrections officers were raised. The Court notes that the majority of Plaintiffs' arguments as to why Defendant Kirkpatrick should be held liable revolve around gross negligence or deliberate indifference,

which the Court has already found is insufficient to establish supervisory liability on this claim post-*Iqbal*.

Nor have Plaintiffs alleged facts plausibly suggesting that Defendant Kirkpatrick's actions constitute allowance of the continuation of a policy or custom merely based on his alleged awareness of reports of certain alleged incidents of retaliation or abuse. Notably, some of the letters allegedly sent to Defendant Kirkpatrick involve grievances over general abuse or perceived mistreatment, but not specifically complaining that those incidents were in retaliation for protected conduct, and the few instances of reports of retaliatory conduct (a letter from Plaintiff Scott on September 22, 2015, about threats of retaliation by Defendant Gregory and letters from Plaintiff DeJesus from or received January 4 and 19, 2016, related to various acts of retaliation by two corrections officers against prisoners related to grievances over the prohibition of dominos games) are not so pervasive as to plausibly suggest a policy or custom specifically of retaliation for pursuing grievances. After all, the question here is not whether there was a policy or custom of unconstitutional conduct in Clinton Correctional Facility as a general matter, but specifically a policy or custom of retaliation for engaging in protected activity both as individuals and ILC representatives. Plaintiffs' Amended Complaint simply has not alleged facts plausibly suggesting that there was a policy or custom of such retaliation, much less that Defendant Kirkpatrick knew of it and allowed it to continue.

Lastly, the Court cannot say that Plaintiffs' allegation that Defendant Kirkpatrick read a letter reporting retaliation in combination with the allegation that Plaintiff DeJesus was issued a misbehavior report approximately eight days later plausibly suggests that Defendant Kirkpatrick was personally involved in the issuance of that misbehavior report (which Plaintiff DeJesus

alleges was issued by Defendant Dixon), particularly given the fact that Plaintiff DeJesus acknowledges that the misbehavior report was not based solely on the letter but also on his alleged comments during an interview on the date the misbehavior report was issued; Plaintiff DeJesus does not allege that Defendant Kirkpatrick participated in this interview or was even aware of it. (Dkt. No. 17, at ¶¶ 65-66 [Pls.' Am. Compl.].) Consequently, the Court does not find that Plaintiffs have alleged facts plausibly suggesting that Defendant Kirkpatrick was personally involved in the alleged violations.

As to Defendant Venettozzi, Plaintiffs DeJesus and Emerenciano allege that Defendant Venettozzi was personally involved in the allegedly unconstitutional disciplinary actions against them because he was responsible for reviewing the appeals from those actions and he affirmed the hearing decisions. This Court has previously found that there is personal involvement (at least for the purposes of a motion to dismiss) "where a supervisory official affirms an allegedly constitutionally infirm hearing decision." *King v. McIntyer*, 11-CV-1457, 2014 WL 689028, at *10 (N.D.N.Y. Feb. 20, 2014) (Dancks, M.J., Hurd, J.) (collecting cases); *accord Bennett v. Fischer*, 09-CV-1236, 2010 WL 5525368, at *11-12 (N.D.N.Y. Aug. 17, 2010) (Peebles, M.J.), *adopted by* 2011 WL 13826 (N.D.N.Y. Jan. 4, 2011). Because Plaintiffs DeJesus and Emerenciano specifically allege that Defendant Venettozzi reviewed and upheld the decisions on their misbehavior report hearings, he has sufficiently alleged that Defendant Venettozzi was personally involved in those violations in light of the fact that Plaintiff DeJesus alleges that Defendant Venettozzi eventually reversed the decision on that incident and expunged it from his record, and Plaintiff Emerenciano alleges that Defendant Venettozzi assessed the hearing decision in a thorough enough manner that he found a basis to modify the sanction imposed from

270 days to 180 days in SHU; such allegations plausibly suggest for the purposes of this motion to dismiss that Defendant Venettozzi did more than merely "rubber-stamp" the hearing decision and thus was directly involved in the alleged violation. (Dkt. No. 17, at ¶¶ 127-30 [Pls.' Am. Compl.].) *See also Ward v. Lee*, 16-CV-1224, 2018 WL 4610682, at *11 (N.D.N.Y. July 3, 2018) (Hummel, M.J.) (granting motion to dismiss claim of supervisory liability where the supervisory defendant's affirmance of the disciplinary hearing decision was a "mere rubber stamp" on that decision) *adopted by* 2018 WL 3574872 (N.D.N.Y. July 25, 2018) (Scullin, J.); *Barnes v. Fischer*, 13-CV-0164, 2018 WL 5660414, at *20 (N.D.N.Y. Mar. 16, 2018) (Stewart, M.J.) (noting that whether affirmance of a disciplinary hearing decision constitutes personal involvement turns on whether "the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results"), *adopted by* 2018 WL 4660380 (N.D.N.Y. Sept. 28, 2018) (Sharpe, J.).

For all of the above reasons,[7] the Court grants Defendants' motion to dismiss Plaintiffs' Second Claim against Defendant Annucci and Defendant Kirkpatrick, but denies Defendants' motion to dismiss Plaintiffs' Second Claim against Defendant Venettozzi as to Plaintiffs DeJesus and Emerenciano's First Amendment claims.

## 2.    Fourteenth Amendment Claims

Because Plaintiffs DeJesus and Scott's separate Fourteenth Amendment due process

---

[7]    To the extent Plaintiff Scott intended to assert supervisory claims against Defendants Annucci and Kirkpatrick (as suggested by a single paragraph of the Amended Complaint), such claims must be dismissed based on Plaintiff Scott's failure to assert factual allegations as to the nature of any involvement by either of those Defendants related to Defendant Scott's incoming mail, and his failure to assert any factual allegations of a policy or custom of withholding and/or destroying incoming mail from journalists. (Dkt. No. 17, at ¶¶ 139-82 [Pls.' Am. Compl.].)

claims have already been found to warrant dismissal, the Court need only consider whether

Defendant Venettozzi was personally involved in the alleged violations of Plaintiff

Emerenciano's Fourteenth Amendment due process rights.[8]

Plaintiff Emerenciano's claim of supervisory liability is sufficiently pled for his

Fourteenth Amendment claim for the same reasons as discussed above for the First Amendment

claim because it relies on the same conduct, namely Defendant Venettozzi's modification of the

hearing decision.  Consequently, the Court denies Defendants' motion to dismiss the Second

Claim against Defendant Venettozzi as to Plaintiff Emerenciano's remaining Fourteenth

Amendment claim against Defendant Venettozzi.

> **F.**     **Whether Plaintiffs Have Alleged Facts Plausibly Suggesting a Claim for
>             Conspiracy Under 42 U.S.C. § 1983**

After careful consideration, the Court answers this question in the negative for the

reasons stated in Defendants' memoranda of law.  (Dkt. No. 25, Attach. 1 [Defs.' Mem. of Law];

Dkt. No. 39 [Defs.' Reply Mem. of Law].)  To those reasons, the Court adds the following

analysis.

"A conspiracy claim under Section 1983 must allege that: (1) an agreement existed

between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff

---

[8]     The Court finds that any claims of supervisory liability based on the Fourteenth
Amendment claims asserted against Defendants Annucci and Kirkpatrick must be dismissed
because (a) the Court has already dismissed all Fourteenth Amendment claims other than
Plaintiff Emerenciano's against Defendant Bell and thus no supervisory liability can attach as to
those dismissed claims, (b) Plaintiffs' Second Claim appears to address supervisory liability only
as to the retaliation allegations even though it also cited the Fourteenth Amendment, and (c) there
are no factual allegations expressly against Defendants Annucci or Kirkpatrick related to any of
the Plaintiffs' Fourteenth Amendment claims (e.g., that they were aware of Plaintiffs'
confinement in keeplock/SHU or the hearings that resulted in that confinement, or the tampering
with Plaintiff Scott's mail).

and (2) an overt act was committed in furtherance of that goal." *Rasheen v. Adner*, 356 F. Supp. 3d 222, 235 (N.D.N.Y. 2019) (Hurd, J.) (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 [2d Cir. 2002]). "[V]ague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed." *Rasheen*, 356 F. Supp. 3d at 236.

The Court agrees with Defendants that Plaintiffs have not alleged any facts plausibly suggesting that there was any agreement between Defendants Rock and Bell and any other Defendant to violate Plaintiffs DeJesus or Emerenciano's constitutional rights. Rather, the Amended Complaint alleges only that these Defendants conspired "with the other Clinton defendants" in their role as hearing officers to violate Plaintiffs' due process rights. (Dkt. No. 17, at ¶ 185 [Pls.' Am. Compl.].) Nor can the Court find any other factual allegations that plausibly suggest an actual agreement between any of the Defendants related to the relevant conduct.

Consequently, Plaintiffs have not alleged facts plausibly suggesting a claim of conspiracy and this claim must be dismissed.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 25) is **<u>GRANTED</u> in part** and **<u>DENIED</u> in part** as described above in this Decision and Order; and it is further

**ORDERED** that the following claims are **<u>DISMISSED</u>**:

(a)     Plaintiff Scott's First Claim under the First Amendment to the extent it is asserted against Defendants Holdridge, Crowley, and Gregory;

(b)     Plaintiff DeJesus' Third and Fourth Claims under the Fourteenth Amendment;

(c)     Plaintiff Scott's Fifth Claim under the First and/or Fourteenth Amendment; and

(d)     Plaintiffs' Second Claims of supervisory liability against Defendants Annucci and Kirkpatrick; and it is further

**ORDERED** that the following claims **<u>SURVIVE</u>** this motion to dismiss:

(a)     Plaintiffs' First Claim under the First Amendment as asserted by Plaintiffs DeJesus and Emerenciano against all relevant Defendants, and as asserted by Plaintiff Scott to the extent it is asserted against Defendant Houck based on his alleged transfer of Plaintiff;

(b)     Plaintiff Emerenciano's Third Claim under the Fourteenth Amendment against Defendant Bell;

(c)     Plaintiff Emerenciano's Fourth Claim under the Fourteenth Amendment against Defendant Venettozzi; and

(d)     Plaintiffs' Second Claim of supervisory liability against Defendant Venettozzi; and it is further

**ORDERED** that Defendants Annucci, Kirkpatrick, Holdridge, Crowley, and Gregory are **<u>DISMISSED</u>** from this action.

Dated: September 23, 2019
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge