UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

YOLANDA KEYES, Administratrix of the Estate of
Francisco DeJesus; HERRON EMERENCIANO;
and RASHAD SCOTT,

                    Plaintiffs,

                                                        9:18-CV-0372
v.                                                      (GTS/DJS)

DONALD VENETTOZZI, Director Special Housing
and Inmate Discipline; MICHAEL DIXON, Sergeant;
JEFFERY ROCK, Lieutenant; EARL BELL, Deputy
Superintendent of Security; JERRY KOWALOWSKI,
Recreation Program Leader; and RICHARD HOUCK,
Transfer Coordinator,

                    Defendants.
_____

APPEARANCES:                                OF COUNSEL:

PRISONERS' LEGAL SERVICES OF NY             HALLIE E. MITNICK, ESQ.
  Counsel for Plaintiffs                    MEGAN WELCH, ESQ.
114 Prospect Street
Ithaca, NY 14850

HON. LETITIA A. JAMES                        ERIK B. PINSONNAULT, ESQ.
Attorney General for the State of New York   Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, NY 12224

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

        Currently before the Court, in this prisoner civil rights action filed by Yolanda Keyes (as

administratrix of the estate of Francisco DeJesus),[1] Herron Emerenciano, and Rashad Scott

("Plaintiffs") against Special Housing and Inmate Discipline Director Donald Venettozzi,

Sergeant Michael Dixon, Deputy Superintendent of Security Earl Bell, Sergeant Jeffery Rock,

_____
[1]        The Court notes that, for the ease of reading, it will still refer to Francisco DeJesus as a
plaintiff in this action.

Recreation Program Leader Jerry Kowalowski, and Transfer Coordinator Richard Houck

("Defendants"), is Defendants' motion for summary judgment.  (Dkt. No. 69.)  For the reasons

set forth below, Defendants' motion is granted in part and denied in part.

## I.    RELEVANT BACKGROUND

### A.    Plaintiffs' Amended Complaint

Generally, Plaintiffs' Amended Complaint alleges that Defendants violated their due

process rights and took various adverse actions against them at Clinton Correctional Facility

("Clinton") in 2015 and 2016 as a result of Plaintiffs' election (by fellow prisoners) to Clinton's

Inmate Liaison Committee ("ILC") following the well-publicized escape of two inmates

(Richard Matt and David Sweat) from Clinton's Honor Block.  (Dkt. No. 17 [Pls.' Am.

Compl.].)  Five claims in the Amended Complaint survived the Court's Decision and Order of

September 23, 2019: (1) a First Amendment retaliation claim by Plaintiff DeJesus against

Defendants Dixon and Rock; (2) a First Amendment retaliation claim by Plaintiff Emerenciano

against Defendants Kowalowski and Bell; (3) a First Amendment retaliation claim by Plaintiff

Scott against Defendant Houck; (4) a Fourteenth Amendment due process claim by Plaintiff

Emerenciano against Defendants Bell and Venettozzi; and (6) a supervisory liability claim by

Plaintiffs against Defendant Venettozzi.  (Dkt. No. 40, at 50.)

### B.    Undisputed Material Facts on Defendants' Motion for Summary Judgment

Before reciting the undisputed material facts on Defendants' motion, the Court observes

that, in addition to their Rule 7.1 Response, Plaintiffs have submitted what they characterize as a

"Statement of Additional Facts" that "are either undisputed or at least supported by sufficient

record evidence that the jury could accept them . . . ."  (Dkt. No. 73, Attach. 1, at 9-22.)  Of

course, no Statement of *Undisputed* Additional Facts is permitted under the District's Local

Rules of Practice.  *See* N.D.N.Y. L.R. 56.1(b) ("In addition, the opposing party's Response may set forth any assertions that the opposing party contends are in dispute in a short and concise Statement of Additional Material Facts *in dispute* . . . .") (emphasis added).  Furthermore, many of Plaintiffs' additional factual assertions are immaterial to the resolution of the issues presented by Defendants' motion.  *Id.* (permitting a "Statement of Additional *Material* Facts in Dispute . . . .") (emphasis added).  However, to the extent Plaintiffs actually assert additional material facts not in dispute, the Court will take them into consideration in its below recitation of the undisputed material facts.

The following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and either expressly admitted by Plaintiffs or denied by them without appropriate record citations in their response thereto.  (*Compare* Dkt. No. 69, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 73, Attach. 1 [Pls.' Rule 7.1 Resp.].)

<u>Defendant Dixon's Misbehavior Report Against Plaintiff DeJesus</u>

1.      At some point before January 27, 2016, Defendant Dixon received from the staff at Clinton both a copy of both a letter authored and sent by Plaintiff DeJesus to the State Commission on Corrections ("SCOC") and a direction to investigate the letter (at least in part) for a possible violation of disciplinary rules by Plaintiff DeJesus.[2]

2.      During his investigation into the matter, Defendant Dixon interviewed Plaintiff DeJesus.

3.      During this interview, Plaintiff DeJesus reiterated the same assertions that he had included in his letter to the SCOC.

---

[2]      The Court notes that, although Plaintiffs dispute "in part" this statement of material fact, they cite to no admissible record evidence controverting it.

4.      Based upon the letter that Plaintiff DeJesus had sent to the SCOC, his remarks made to Defendant Dixon during his interview, and Defendant Dixon's consultation with Defendant Rock, Defendant Dixon issued a misbehavior report against Plaintiff DeJesus dated January 27, 2016, charging him with violations of Disciplinary Rules 102.10 and 107.11.

5.      On February 1, 2016, Defendant Rock began to conduct Plaintiff DeJesus' Tier III disciplinary hearing.  Defendant Rock was the only Defendant who conducted Plaintiff DeJesus' Tier III disciplinary hearing.

6.      Defendant Rock completed this hearing on February 12, 2016, finding Plaintiff guilty of both charges.

7.      On June 3, 2016, Defendant Venettozzi reversed the decision that had been issued by Defendant Rock after the completion of the Tier III hearing on February 12, 2016.[3]

8.      Defendant Venettozzi electronically signed the document memorializing the reversal of Defendant Rock's decision.

Defendant Kowalowski's Misbehavior Report Against Plaintiff Emerenciano

9.      Defendant Kowalowski is currently employed by the New York State Department of Corrections and Community Supervision ("DOCCS") as a Recreation Program Leader Two ("RPL Two").

10.      Excluding a brief stint between early 2016 through July 2016, when he served as a Recreation Program Leader Three ("RPL Three") at Upstate Correctional Facility ("Upstate"), Defendant Kowalowski has held the position of RPL Two at Clinton since approximately 2004 or 2005.

---

[3]      The Court notes that the Superintendent's hearing reversal resulted in the expunction of both charges against Plaintiff DeJesus.

11.     During one of the ILC's meetings at Clinton in or around October 2015, some ILC members had expressed their disagreement with a policy that requires inmates to lay on the ground when an altercation occurs in the prison yard.[4]

12.     During the ILC meeting, Plaintiff Emerenciano expressed concerns about problems the policy could lead to at the prison.[5]

13.     After this ILC meeting, the administration instructed Defendant Kowalowski to issue a misbehavior report against Plaintiff Emerenciano for making threats.[6]  Defendant

---

[4]     The Court deems this fact to be undisputed because Plaintiffs have failed to provide a specific record cite in support of their partial dispute of this fact.  *See* N.D.N.Y. L.R.(a)(3) ("Each fact listed shall set forth a specific citation to the record where the fact is established . . . Each denial shall set forth a specific citation to the record where the factual issue arises."); *see also, e.g.*, *Rizzo v. Health Rsch., Inc.*, 12-CV-1397, 2016 WL 632546, at *2 (N.D.N.Y. Feb. 16, 2016) ("Of these 136 denials, 117 denials do not contain a specific citation to the record. Therefore, the facts 'denied' by these paragraphs will be deemed admitted."); *Benson v. Otis Elevator Co.*, 10-CV-3246, 2012 WL 4044619, at *1, n.1 (S.D.N.Y. Sept. 13, 2012) (deeming fact asserted by movant to be admitted by non-movant where non-movant supported denial "only with non-specific citations to the entire testimony of several witnesses"); *Univ. Calvary Church v. City of New York*, 96-CV-4606, 2000 WL 1538019, at *2, n.6 (S.D.N.Y. Oct. 17, 2000) ("Despite the clear language of Rule 56 requiring specificity, Plaintiffs rarely offers an exact cite in support of their version of the facts . . . [A] vague cite to all of the exhibits is simply unacceptable.").

[5]     The Court notes that Defendant Kowalowski (who was present at the meeting) has testified that he heard Plaintiff Emerenciano say that "it would only take one inmate to stand up during a similar situation in the future, and that there will be another 'eighty-three' as a result." Defendant Kowalowski interpreted this use of the term "eighty-three" as a reference to a prison riot that had occurred at Clinton in 1983.  However, Plaintiff Emerenciano has testified that he never said such a thing and had not even known of the 1983 riot at the time.

[6]     The Court deems this fact to be undisputed by Plaintiffs because Plaintiffs' Rule 7.1 Response begins with the word "Undisputed," and then attempts to provide more "specific[s]" about the above asserted fact. *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider each statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed'").

Kowalowski issued a misbehavior report against Plaintiff Emerenciano dated October 2, 2015, charging him with violating Disciplinary Rules 102.10 and 104.12.

14.     On October 8, 2015, Defendant Bell conducted Plaintiff Emerenciano's Tier III disciplinary hearing at Upstate.

15.     At Plaintiff Emerenciano's Tier III disciplinary hearing, Defendant Bell served as the hearing officer.

16.     Defendant Bell found Plaintiff Emerenciano guilty of the charges set forth in the misbehavior report that Defendant Kowalowski had issued.

17.     On November 30, 2015, the Acting Director of the Special Housing and Inmate Disciplinary Program, Corey Bedard, reviewed and modified Plaintiff Emerenciano's Special Housing Unit ("SHU") confinement time from 270 days to 180 days, with 90 of those days being suspended.  On April 16, 2016, Defendant Venettozzi reversed the outcome of the Tier III disciplinary hearing that had occurred on October 8, 2015.

<u>Defendant Houck's Transfer of Plaintiff Scott</u>

18.      Defendant Houck is employed by DOCCS as a classification analyst in its Office of Classification and Movement ("OCM").

19.     Defendant Houck works at the DOCCS' offices located in Albany, New York, and not at Clinton.

20.     In his role as a classification analyst, Defendant Houck oversees inmate transfers between DOCCS correctional facilities.  Defendant Houck receives reviews from individual correctional facilities, processes those reviews and decides these transfers.  Specifically, Defendant Houck receives reviews when a correctional facility sends an electronic copy of a transfer referral through one of two possible methods.  First, some of the inmate "transfer

referrals are scheduled at the facility, possibly due to a change in security, or due to an inmate's preference."  Second, some of the inmate transfer referrals are "unscheduled transfer reviews from facilities for other reasons, including medical or mental health reasons."  However, before Defendant Houck receives a transfer referral from a DOCCS facility, three DOCCS employees—the Offender Rehabilitation Coordinator ("ORC"), Supervising Offender Rehabilitation Coordinator ("SORC"), and the Deputy Superintendent of Programs working at that facility—ordinarily must approve the transfer referral.  Furthermore, ordinarily, Defendant Houck receives several hundred transfer referrals each month.

21.     On October 7, 2015, Plaintiff Scott underwent what is known as a "preference lateral transfer" review at Clinton.

22.     Plaintiff Scott had indicated a preference to be transferred to the Sullivan hub.

23.     On or about October 27, 2015, Plaintiff Scott was transferred from Clinton to Green Haven Correctional Facility ("Green Haven").

# I.     RELEVANT LEGAL STANDARDS

## A.     Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[7]  As for the materiality requirement, a dispute of

---

[7]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[the non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).

**B.    Standard Governing Claims Under 42 U.S.C. § 1983**

Section 1983 of the Civil Rights Act of 1871 provides a civil claim for damages against any person who, acting under color of state law, deprives another person of a right, privilege or immunity secured by the Constitution or the laws of the United States.  42 U.S.C. § 1983; *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999).  Section 1983 does not create any substantive right in and of itself, but rather serves as the statutory vehicle by which individuals can seek redress in federal court for alleged violations of federal statutory or constitutional rights.  It is well established that state prisoners are protected by Section 1983 and may bring claims based on their deprivation of rights while subject to confinement.  *Cooper v. Pate*, 378 U.S. 546, 546 (1964).  In a case where a prisoner is suing prison officials based on their deprivation of rights, Section 1983 serves a dual purpose: first, to deter prison officials, acting as state actors, from using their authority to deprive prisoners of their constitutional rights, and second, to provide relief to prisoners when necessary.  *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

### 1.      Standard Governing Retaliation Claims Under the First Amendment

To establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: "(1) . . . the speech or conduct at issue was protected, (2) . . . the defendant took adverse action against the plaintiff, and (3) . . . there was a causal connection between the protected speech and the adverse action." *Espinal v Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted).  "[I]n the prison context . . . adverse action" is "defined . . . objectively[] as retaliatory conduct that would deter a similarly situated individual of ordinary fitness from exercising . . . [his or her] constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted).  Notably, "this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill*, 389 F.3d at 381.  With respect to the existence of a causal connection between the plaintiff's alleged protected conduct and the defendant's alleged adverse action, although "' [a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was in close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, . . . without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie*, 791 F. Supp.2d 353, 370 (S.D.N.Y. 2011) (quoting *Espinal*, 558 F.3d at 129).

However, "[e]ven if [a] plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." *Brooks v. Rock*, 11-CV-1171, 2014 WL 1292232, at *18 (N.D.N.Y. Mar. 28, 2014) (Sharpe, C.J.); *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary

judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred.") (italics omitted).

"[P]risoner retaliation claims are easily fabricated, and . . . pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennet v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). As a result, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." *Colon*, 58 F.3d at 872. Therefore, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." *Green v. Phillips*, 04-CV-10202, 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (citing *Brown v. Middaugh*, 41. F. Supp.2d 172, 191 [N.D.N.Y. 1999]). Furthermore, a plaintiff must provide non-conclusory allegations in support of his or her retaliation claim. *Green*, 2006 WL 846272, at *3; *see Williams v. Goord*, 111 F. Supp.2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claims appear insubstantial.") (internal quotation marks and citation omitted).

Finally, allegations set forth in support of retaliation claims "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." *Smith v. Woods*, 03-CV-0480, 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006).

### 2. Standard Governing Procedural Due Process Claims Under the Fourteenth Amendment

The Fourteenth Amendment's Due Process Clause protects an individual's procedural and substantive rights. *Page v. Cuomo*, 478 F. Supp.3d 355, 370 (N.D.N.Y. 2020). With regard

to an individual's procedural due process rights, a prisoner "has the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). Therefore, to establish a procedural due process claim, a plaintiff must show two elements: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F. Supp.3d 223, 225 (2d Cir. 2001).

With regard to the first element, generally, "[p]rison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Burroughs*, 325 F. Supp.3d at 275. To constitute an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the population of the facility as well as those in administrative and protective confinement." *Id.* at 276. The Court should consider both the duration and the conditions of confinement when assessing the severity of the hardship. *Id.* Generally, confinements in SHU for a period up to 101 days under normal conditions will not constitute an atypical hardship, while confinement for a period of more than 305 days has been considered atypical even under normal conditions. *Id.* The Second Circuit has indicated that "the ultimate issue of atypicality is one of law." *Sealey v. Giltner*, 187 F.3d 578, 585 (2d Cir. 1999).

With regard to the second element, generally, the amount of process given to a plaintiff depends on three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of erroneous deprivation of such interest through the procedures used;" and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

11

###### 3.     Standard Governing Supervisory Liability Claims Under the First and Fourteenth Amendments

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 [2d Cir. 1991]); *see also McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) (reiterating that, in order to award damages under Section 1983, defendants must be personally involved in the plaintiff's alleged constitutional deprivation).  Pursuant to this requirement, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'"  *Austin v. Pappas*, 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 [2d Cir. 1986]) (other citation omitted).  More simply stated, a complaint needs to allege who did what, and how that behavior is actionable under the law. *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).  As for who did what, the Second Circuit has defined "personal involvement" to include both direct participation (i.e., the personal participation by a person who has knowledge of the facts that make their conduct illegal) and indirect participation (i.e., the ordering or helping of others to conduct themselves in an unlawful manner).  *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001).

With respect to how to establish the personal involvement of supervisory officials, "a plaintiff asserting a Section 1983 claim against a supervisory official in his individual capacity must allege that the supervisor was personally involved in the alleged constitutional deprivation."  *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001).  This means that "a defendant in a Section 1983 action may not be held liable for damages for constitutional violations merely because [he or she] held a high position of authority."  *Black v.*

12

*Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (affirming a district court's dismissal of claims against a prison officer where the inmate-plaintiff failed to allege the officer's personal involvement in, or awareness of, the health and safety concerns raised by the plaintiff).

Until 2009, when the Supreme Court decided *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*"), the Second Circuit's general rule was that a supervisory official's personal involvement could have been proven by showing any five factors:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("*Colon*").

However, *Iqbal* cast some doubt on the supervisory liability test set forth in *Colon*. *See Reynolds v. Barrett*, 685 F.3d 193, 205 (2d Cir. 2012) (stating that the decision in *Iqbal* caused conflict with the Second Circuit about the continued vitality of the supervisory liability test, but declining to rule on the issue because it did not apply to the facts of the case).[8] It was unclear in the Second Circuit, up until recently, how the *Iqbal* decision would affect the *Colon* test.[9]

---

[8]    In *Iqbal*, after a Pakistani Muslim detainee filed suit against federal officials for confinement based on religion, race, and/or national origin, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. *Iqbal*, 556 U.S. at 676.

[9]    In 2013, the Second Circuit decided two cases surrounding this issue: (1) in *Grullon v. City of New Haven*, the Circuit implied that *Iqbal* may have heightened the requirements for showing a supervisor's personal involvement (but did not directly rule on it) and (2) in *Hogan v. Fischer*, 738 F.3d 509, 513 n.3 (2d Cir. 2013), the Circuit expressed no view on the extent to which Iqbal may have heightened the requirements for showing a supervisor's personal

In December 2020, the Second Circuit held that "there is no special rule for supervisory liability" and, that a "plaintiff must plead and prove 'that each [g]overnment-official defendant, through the official's *own individual actions*, had violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676) ("*Tangreti*"). "'The factors necessary to establish a [Section 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary."  *Tangreti*, 983 F.3d at 618 (quoting *Iqbal*, 556 U.S. at 676).  Therefore, any constitutional violation brought under Section 1983 must be established against the supervisory official directly.  *Tangreti*, 983 F.3d at 618.

Since *Tangreti* was decided in December 2020, courts in this Circuit have interpreted it in the same way: that the new standard in *Tangreti* has abrogated and completely replaced the factors set forth in *Colon*.  *See, e.g.*, *Zielinski v. Annucci*, 17-CV-1042, 2021 WL 2744684, at *8 (N.D.N.Y. July 2, 2021) (explaining that the Second Circuit's holding in *Tangreti* abrogated the factors from *Colon* and catalogued the confusion over to what extent the Supreme Court's decision in *Iqbal* effected those factors); *Delaney v. Perez*, 19-CV-6084, 2021 WL 3038642, at *3 (S.D.N.Y. July 16, 2021) (stating that the standards for supervisory liability set out in *Colon* may not be used, as they have been replaced with the new standard set forth in *Tangreti*: that each government-official, through the official's own individual actions, must have violated the Constitution); *Smith v. Westchester Cnty.*, 19-CV-3605, 2021 WL 2856515, at *6 (S.D.N.Y. July 7, 2021) (explaining that in the context of a Fourteenth Amendment claim, the standards for supervisory liability from *Colon* may not be used, and instead, a plaintiff must demonstrate,

---

involvement.  *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).  More recently, in 2019, this Court explained that the Second Circuit had not yet addressed how *Iqbal* affected the standards in *Colon* for establishing supervisory liability, it may have limited the *Colon* factors (so as to permit the use of only the first and third factors listed above).  *Rasheen v. Adner*, 356 F. Supp.3d 222, 233-34 (N.D.N.Y. 2019).

through factual allegations, that each individual defendant meets all the elements required by the specific claim raised by the plaintiff); *Savarese v. City of New York*, 18-CV-5956, 2021 WL 2784501, at *28 (S.D.N.Y. July 2, 2021) (stating that *Tangreti* repudiated *Colon* and established a new standard); *Hill v. Cook*, 21-CV-0851, 2021 WL 2661676, at *3 (D. Conn. June 29, 2021) (explaining that the Second Circuit adopted the holding from *Iqbal* in their decision in *Tangreti*, so ultimately, the new standard is that each defendant must be personally aware of or disregard the alleged constitutional violation being raised by the plaintiff).

"[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Rasheen v. Adner*, 356 F. Supp.3d 222, 235 (N.D.N.Y. 2019). Where the defendants are supervisory officials, "a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct." *Id.* (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 [1981]; *Richardson v. Goord*, 347 F.3d 431, 435 [2d Cir. 2003].)

I.     ANALYSIS

A.     Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' First Amendment Retaliation Claims Against Them

1.     Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Dixon

It is well settled that an inmate's filing of grievances while participating on an ILC and writing of complaints to the SCOC constitute constitutionally protected activity. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (holding that "filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the ILC," constitutes

constitutionally protected conduct); *Vega v. Artus*, F. Supp.2d 185, 206 (N.D.N.Y. 2009) (Suddaby, J.) (recognizing that filing grievances is a constitutionally protected activity); *Wheeler v. Goord*, 03-CV-0787, 2005 WL 2180451, at *9 (N.D.N.Y. Aug. 29, 2005) (Peebles, M.J.) ("[P]laintiff's alleged filing of grievances and writing of letters to prison authorities . . . constituted protected activity within the ambit of First Amendment retaliation jurisprudence.").

Moreover, the receipt of a false misbehavior report resulting in punishment and/or the receipt of a transfer to a different facility have been found to constitute adverse actions. *See Cabbagestalk v. Hudson*, 15-CV-0167, 2016 WL 5404233, at *4 (N.D.N.Y. Aug. 29, 2016) (Hummel, M.J.) ("[A]n inmate's transfer to a different facility does constitute an adverse action if done in retaliation for the inmate's exercise of his or her rights under the First Amendment.") (citing *Smith v. Levine*, 510 F. App'x 17, 21 [2d Cir. 2013]), *adopted by* 2016 WL 5394734 (N.D.N.Y. Sept. 27, 2016) (Sharpe, J.); *Reed v. Doe No. 1*, 11-CV-0250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (Peebles, M.J.) (finding that the "filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *adopted by* 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012) (McAvoy, J.); *Tafari v. McCarthy*, 714 F. Supp.2d 317, 373 (N.D.N.Y. 2010) (Lowe, M.J., Hurd, J.) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action).

As a result, the issue before the Court is whether the causation element of a retaliation claim has been established. Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Dixon issued a misbehavior report against DeJesus for retaliatory purposes. (Dkt. No. 69, Attach. 2, at 6-9 [Defs.' Mem. of Law].)[10]  According to Defendant

___
[10]   Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office, and not the numbers on the documents themselves.

Dixon, he neither attended any ILC meetings nor served on the IGRC at the relevant time period (i.e., 2015 through 2016), during which Plaintiff DeJesus made complaints of assault and harassment by DOCCS staff.  (*Id.* at 7-8.)

More specifically, Defendant Dixon argues that he received a copy of the letter-complaint that Plaintiff DeJesus had sent to the SCOC, and was directed to investigate whether Plaintiff DeJesus had violated any prison disciplinary rules.  (Dkt. No. 69, Attach. 6, at 2 [Dixon Decl.].)  As part of his investigation, Defendant Dixon interviewed Plaintiff DeJesus, and Plaintiff DeJesus repeated the same assertions that he had made in his letter to the SCOC.  (*Id.*)  At the conclusion of his investigation, Defendant Dixon believed that Plaintiff DeJesus "constituted a threat . . . to the safety and operation of the facility."  (*Id.*)  Specifically, Defendant Dixon believed that the letter written to SCOC had indicated that Plaintiff DeJesus "would take action against any [DOCCS] staff member who attempted to discipline [him] for future misconduct."  (*Id.*)  Before issuing the misbehavior report to Plaintiff DeJesus, Defendant Dixon consulted with both a member of the IGRC and Clinton's "tier hearing lieutenant" to determine if Defendant Dixon was correctly perceiving a threat from Plaintiff DeJesus.  (*Id.* at 2-3.)[11]  Both individuals informed Defendant Dixon that Plaintiff DeJesus' actions warranted the issuance of a misbehavior report.  (*Id.*)

Not surprisingly, Plaintiff DeJesus disputes Defendant Dixon's version of events. Plaintiff DeJesus argues that Defendant Dixon issued him a misbehavior report "expressly upon the nature and content of his complaint letter [sent] to the SCOC," and his statement that he would pursue legal action if his protected conduct resulted in unlawful retaliation.  (Dkt. No. 73, at 19-20 [Pls.' Opp'n Mem. of Law].)  More specifically, Plaintiffs argue that it is undisputed

---

[11]     The Court notes that this "tier hearing lieutenant" was Defendant Rock (Dkt. No. 69, Attach. 10, at 78.)

that Defendant Dixon issued a misbehavior report to Plaintiff DeJesus for "filing grievances and writing complaints to the SCOC and imposing disciplinary sanctions and placing him in [k]eeplock confinement as retaliation for [filing] those grievances, all of which resulted in his summary removal from the ILC and loss of an opportunity to appear early before the merit parole board for release consideration." (*Id.* at 18-24.)

According to Defendant Dixon's inmate misbehavior report against Plaintiff DeJesus dated January 27, 2016, Plaintiff DeJesus was interviewed in the IGRC office about the letter complaint he had sent to the SCOC regarding DOCCS officers Benware and Favreau. (Dkt. No. 69, Attach. 18.) Furthermore, according to the misbehavior report, Plaintiff DeJesus had written that "any attempt to discipline him will result in a '[c]ivil [a]ction' against [DOCCS officers Benware and Favreau]." (*Id.*) As a result, according to the misbehavior report, Defendant Dixon charged Plaintiff DeJesus with making threats and engaging in verbal harassment, and ordered that he "keeplocked," because Defendant Dixon had found that Plaintiff DeJesus' statements constituted a "clear threat to the operation of 40-1 building where he is housed as well as the safety of [DOCCS] [o]fficers Benware and Favreau." (*Id.*)

Generally, no violation of Rules 102.10 and 107.11 occurs when a prisoner tells a corrections officer that the prisoner will file a lawsuit against the corrections officer, unless the lawsuit is patently frivolous. *Compare Davidson v. Lee*, 104 F.3d 352, at *1 (2d Cir. 1996) (denying defendants' motion for summary judgment where "Wood's [misbehavior] report arguably supports Davidson's allegation as it refers to Davidson's threat of litigation—'I'm going to sue you and your family'—therefore indicating that Davidson's propensity for filing lawsuits may have been a factor the defendants considered in filing the reports.") *and Amaker v. Goord*, 06-CV-0490, 2012 WL 4718661, at *7 (W.D.N.Y. Aug. 16, 2012) ("[T]he hearing

officer found '[i]ndicating you intend to sue is not a violation of 102.10' . . . .") *with Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *7, n.11 (N.D.N.Y. Nov. 29, 2011) ("[F]iling a court action that is frivolous is not constitutionally protected activity.").

Here, based on the current record, the Court is unable to find that the lawsuit referenced by Plaintiff DeJesus was patently frivolous.  The Court respectfully disagrees with Defendant Rock's understanding that Plaintiff DeJesus was saying that he would sue even if he were charged with a disciplinary violation "for good cause."  (Dkt. No. 69, Attach. 14, at 81.)  To the contrary, Plaintiff DeJesus expressly conditioned the filing of a lawsuit on "any *fabrication* of contraband; drugs; weapons, etc."  (Dkt. No. 69, Attach. 19, at 8 [emphasis added].)

Under the circumstances, the Court finds that a jury could reasonably find that there was a causal connection between Plaintiff DeJesus' protected speech (i.e., his statement that he would pursue future legal action against officers Benware and Favreau if they continued to discipline him) and the adverse action taken by Defendant Dixon (i.e., his filing of the misbehavior report against Plaintiff DeJesus that resulted in his keeplock confinement).

For all these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Dixon.

### 2.    Plaintiff DeJesus' First Amendment Retaliation Claim Against Defendant Rock

Defendants argue that Plaintiff DeJesus has failed to provide evidence that Defendant Rock took any adverse action against DeJesus and that, if he did so, the adverse action was caused by DeJesus' protected speech.  (Dkt. No. 69, Attach. 2, at 9-10 [Defs.' Mem. of Law].) More specifically, Defendants argue that no evidence exists that Defendant Rock conspired with any other Defendants, or served as a biased hearing officer at Plaintiff DeJesus' Tier III disciplinary hearing.  (*Id.*)  Defendants also argue that the admissible record evidence indicates

that Defendant Rock was not involved in the investigation into Plaintiff DeJesus' alleged misbehavior before being appointed hearing officer.  (*Id.*)  Finally, Defendants argue that Defendant Rock was unaware of Plaintiff DeJesus' discipline history, because he was never mentioned in any of Plaintiff DeJesus' prior grievances made against officers Benware and Favreau, he never served in an active capacity at the ILC meetings, and no other Plaintiffs testified to interacting with (or even meeting) Rock.  (*Id.*)

Plaintiffs respond that Defendant Rock acted with a retaliatory motivation when he improperly punished Plaintiff DeJesus for engaging in protected conduct.  (Dkt. No. 73, at 24 [Pls.' Opp'n Mem. of Law].)  More specifically, Plaintiffs argue that "[i]t is clear from the content of the misbehavior report, which Defendant Rock upheld and condoned, that 'but for' Mr. DeJesus' protected activities the misbehavior report would not have been issued [sic]."  (*Id.*)

Defendant Rock served as the presiding hearing officer for Plaintiff DeJesus' Tier III disciplinary hearing.  According to his declaration, when Defendant Rock was scheduled to serve as a hearing officer, he would not partake in any substantive pre-hearing discussions with DOCCS staff.  (Dkt. No. 69, Attach. 5, at 3 [Rock Decl.].)  At the conclusion of Plaintiff DeJesus' Tier III disciplinary hearing, Defendant Rock found Plaintiff DeJesus guilty of the charges contained within the misbehavior report issued by Defendant Dixon.  (*Id.*)  More precisely, Defendant Rock determined that, by threatening future legal action, Plaintiff DeJesus "was trying to preemptively identify future conflicts with [DOCCS] staff as retaliation and to potentially deter staff from doing their jobs."  (*Id.*)

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer."  *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996).  An impartial hearing officer is "one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess the

20

evidence he has not seen yet." *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990); *see also Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("[I]t would be improper for prison officials to decide the disposition of a case before it was heard.").

Granted, "prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen*, 100 F.3d at 259.  "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally."  *Id.*  On a motion for summary judgment, an inmate's subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis*, 891 F.2d at 47; *Clyde v. Schoellkopf*, 714 F. Supp.2d 432, 437-38 (W.D.N.Y. 2010).

Here, it is uncontroverted that that Defendant Dixon consulted with Defendant Rock before he issued the misbehavior report to Plaintiff DeJesus.  (Dkt. No. 69, Attach. 10, at 78.)  According to Defendant Dixon, Defendant Rock "concurred with [his] interpretation" that, in Plaintiff DeJesus' letter to SCOC, his threat of future "civil action," constituted a "threat[] [against] two officers in the operation of the dorm," thereby warranting the issuance of a misbehavior report.  (*Id.* at 78.)  Moreover, liberally construed, Plaintiff DeJesus' retaliation claim against Defendant Rock alleges retaliation not simply by failing to recuse himself as the hearing officer (due to his involvement in the charging decision)[12] but by conspiring with Defendant Dixon to charge him without adequate grounds.  (Dkt. No. 1, at ¶¶ 13, 67, 83, 183, 185.)

---

[12]     The Court notes that "both DOC[C]S regulations and the law of this Circuit prohibit a prison official who was involved in investigating the underlying charges from acting as a hearing officer."  *Silva v. Sanford*, 91-CV-1776, 1994 WL 455170, at *12 (S.D.N.Y. Aug. 18, 1994); *see also Powell v. Ward*, 542 F.2d 101, 103 (2d Cir. 1976) ("[N]o person who has *participated* in the investigation of [the] acts complained of or who has been a witness to such acts could be a member of a . . . Superintendent's Proceeding relating to those acts." [emphasis added]).

For these reasons, the Court denies Defendants' motion for summary judgment on Plaintiff DeJesus' First Amendment retaliation claim against Defendant Rock.

### 3. Plaintiff Emerenciano's First Amendment Retaliation Claim Against Defendant Kowalowski

Defendants argue that Plaintiff Emerenciano has failed to provide any evidence establishing that any adverse action taken by Defendant Kowalowski against Emerenciano was caused by Emerenciano's protected speech. (Dkt. No. 69, Attach. 2, at 10 [Defs.' Mem. of Law].) Instead, Defendants argue that Plaintiff Emerenciano could only "surmise" that Defendant Kowalowski "probably had to retaliate against [him]" because of a prior grievance that Plaintiff Emerenciano had submitted against Defendant Kowalowski.[13] (*Id.*)

In response, Plaintiffs argue that the evidence establishes as follows: (1) Plaintiff Emerenciano engaged in protected conduct when he was voicing and relaying his constituents' concern at the ILC meeting regarding a newly-imposed prison yard policy that had been implemented by Defendant Bell; (2) Defendant Kowalowski issued a misbehavior report against Plaintiff Emerenciano for engaging in that protected conduct; and (3) Plaintiff Emerenciano's protected conduct directly caused Defendant Kowalowski to issue the misbehavior report. (Dkt. No. 73, at 25-29 [Pls.' Opp'n Mem. of Law].)

During a Clinton ILC meeting in or around October 2015, Plaintiff Emerenciano and his fellow ILC members expressed disagreement with a newly implemented policy implemented by Defendant Bell that required inmates to remain seated on the prison yard ground when an

---

[13]     The Court notes that Plaintiff Emerenciano had submitted a grievance against Defendant Kowalowski because Kowalowski had not placed Emerenciano on the ILC callout list. (Dkt. No. 69, Attach. 17, at 53-54 [Emerenciano Tr.].) In the same grievance, Plaintiff Emerenciano also requested that Defendant Kowalowski be removed from his role as the ILC civilian representative. (*Id.*)

altercation occurs.[14]  (Dkt. No. 73, Attach. 13, at 1-2.)  In particular, inmates expressed the collective frustration that this new policy required them to either lay down or sit on the ground for approximately 20 to 30 minutes if any sort of altercation between inmates occurred in the prison yard, and as a result, be exposed to the potentially severe weather for an unnecessarily long period of time.  (*Id.*)  For example, at the ILC meeting, Plaintiff Emerenciano discussed a previous fistfight (where no weapons were involved) that had occurred between two inmates in Clinton's North Yard.  (*Id.*)  After DOCCS officers had broken-up the fistfight and escorted the two involved inmates off the yard, the other inmates (who were not involved in the altercation) in the yard were required to sit "in the cold [and] mud" for approximately 25 minutes.  (*Id.*)  At the ILC meeting, Plaintiff Emerenciano communicated to Sergeant Hutti, Clinton's Yard Sergeant, that the inmates were left feeling frustrated and angry that day.  (*Id.* at 1-2.)  In addition, Plaintiff Emerenciano informed Sergeant Hutti that, in the approaching winter months, inmates may be less willing to comply with this new policy given the cold weather.  (*Id.* at 2.)  Plaintiff Emerenciano stated that one inmate's decision to not comply with this policy may create a "chain reaction" in other inmates—a conflict that he wished to avoid.  (*Id.*)

Approximately 45 minutes after the ILC meeting had ended, when Plaintiff Emerenciano had already returned to his cell, four DOCCS officers placed him in keeplock restraints and escorted him to SHU.  (*Id.*)  After spending almost three hours in SHU, Plaintiff Emerenciano was informed that he was being transferred to Upstate later that same day.  (*Id.*)  On October 2, 2015, Plaintiff Emerenciano was transferred from Clinton to the SHU at Upstate.  (Dkt. No. 73, Attach. 15.)  On October 5, 2015, Plaintiff Emerenciano was served a misbehavior report issued by Defendant Kowalowski.  (*Id.*)  According to this misbehavior report, at the ILC meeting,

---

[14]     Defendant Kowalowski attended this ILC meeting as the "civilian staff advisor."  (Dkt. No. 73, Attach. 13, at 1.)

"[Plaintiff Emerenciano] stated that if [the policy requiring inmates to remain on the ground of the prison yard] continues we will have another 83 . . . ."  (Dkt. No. 69, Attach. 25, at 1.)

Under these circumstances, the Court finds that there is a genuine dispute of material fact as to the second element of a claim for retaliation.  While a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," "false accusations contained in a misbehavior report can rise to the level of a constitutional violation . . . where the false accusation is based on something more, such as 'retaliation against the prisoner for exercising a constitutional right.'"  *Tafari v. McCarthy*, 714 F. Supp.2d 317, 372 (N.D.N.Y. 2010) (quoting *Boddie v. Schnieder*, 105 F.3d 857, 862 [2d Cir. 1997]).  In other words, in the context of a retaliation claim, there is no question that a falsified misbehavior report constitutes an adverse action.  *See Gill*, 389 F.3d at 381 (holding that a plaintiff's allegations that defendants issued false misbehavior reports against him was sufficient to allege adverse action).

As a result, again, the issue before the Court is whether the causation element of a retaliation claim has been established.  According to Defendant Kowalowski's deposition testimony, the basis for his issuing of a misbehavior report against Plaintiff Emerenciano was Emerenciano's reference to a prison riot that had occurred at Clinton in 1983.  (Dkt. No. 69, Attach. 13, at 139-142, 146 [Kowalowski Tr.].)  Specifically, Defendant Kowalowski testified that, during the ILC committee meeting, Plaintiff Emerenciano stated that the newly implemented prison yard policy could lead to frustration among the inmates, which may ultimately lead to a riot (similar to the riot at Clinton Correctional Facility in 1983).  (*Id.*)

Plaintiff Emerenciano argues that he made no such reference to the 1983 Clinton prison riot, and therefore Defendant Kowalowski's falsified misbehavior report constituted an adverse action.  (Dkt. No. 73, at 25-26 [Pls.' Opp'n Mem. of Law].)  In fact, Plaintiff Emerenciano

testified that he was "unaware of any incident [at Clinton] in 1983" until Defendant Kowalowski

issued him the misbehavior report.  (Dkt. No. 69, Attach. 17, at 52 [Emerenciano Tr.].)

Additionally, other members—Inmate Leon, Inmate Rashawn Scott, Inmate David Maxwell,

Inmate Selah, Inmate Newman, Inmate Matos—of the ILC committee testified to the fact that

they did not recall hearing Plaintiff Emerenciano remark to an "83."  (Dkt. No. 69, Attach. 26, at

11, 14-15, 18, 20-21, 24-25, 29-30.)  Instead, Plaintiff Emerenciano argues that, given his role on

the ILC committee, he was merely informing DOCCS staff of the inmates' growing frustration

regarding the prison yard policy, and proposing possible solutions for the future.  (Dkt. No. 73,

at 26-27 [Pls.' Opp'n Mem. of Law].)  Finally, of at least some materiality is the fact that

Plaintiff Emerenciano had previously filed a grievance against Defendant Kowalowski.

For all of these reasons, the Court denies Defendants' motion for summary judgment on

Plaintiff Emerenciano's First Amendment retaliation claim against Defendant Kowalowski.

### 4.    Plaintiff Emerenciano's First Amendment Retaliation Claim Against Defendant Bell

Defendants argue Plaintiff Emerenciano has failed to provide evidence showing "one

particular thing" that would motivate Defendant Bell to retaliate against him.  (Dkt. No. 69,

Attach. 2, at 14 [Defs.' Mem. of Law].)

Plaintiff Emerenciano responds (persuasively) that has adduced admissible record

evidence from which a reasonable juror could find that (1) Emerenciano had engaged in

constitutionally protected conduct by voicing generalized inmate concern over the newly

implemented prison yard policy to Defendant Kowalowski, and (2) he suffered an adverse action

by being charged with a disciplinary violation by Defendant Kowalowski, and was found guilty

at his Tier III disciplinary hearing and then punished by Defendant Bell.  (Dkt. No. 73, at 25-29

[Pls.' Opp'n Mem. of Law].)  Less clear, however, is whether Plaintiff Emerenciano has shown a causal connection between his protected conduct and the adverse action by Defendant Bell.

Generally, "it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453798, at *4 (S.D.N.Y. Apr. 14, 2011) (citing *Wright v. Goord*, 554 F.3d 255, 274 [2d Cir. 2009]).  Here, Plaintiff Emerenciano must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." *Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996).

Defendant Kowalowski has testified that, after the ILC meeting at which Plaintiff Emerenciano had allegedly mentioned the 1983 Clinton riot, Kowalowski informed Defendant Bell of the remarks that Plaintiff Emerenciano had made.  (Dkt. No. 69, Attach. 13, at 140-41 [Kowalowski Tr.].)  However, Plaintiff Emerenciano has not provided any admissible evidence supporting a reasonable finding that Defendant Bell had somehow been made aware of the fact that Defendant Kowalowski had been lying, and/or that any portion of his misbehavior report had been falsified (an issue that still remains in dispute).  In addition, before the taking of the adverse action at issue, Plaintiff Emerenciano had never filed any grievances against Defendant Bell, and had had no interaction with him.  (Dkt. No. 69, Attach. 17, at 15-16 [Emerenciano Tr.].)  At best, Plaintiff Emerenciano has provided only conclusory allegations that Defendant Bell acted with a retaliatory motivation when he found him guilty at Emerenciano's Tier III disciplinary hearing.

The Court would add only that a guilty finding in an inmate disciplinary hearing only needs to be supported by "some evidence from the conclusion . . . could be deduced." *Hill v. Superintendent*, 472 U.S. 445, 455 (1987).  "[I]t is well-established that a correction officer's misbehavior report may constitute reliable evidence of guilt." *Chavez v. Gutwein*, 20-CV-0342,

2021 WL 4248917, at *12 (S.D.N.Y. Sept. 17, 2021) (citing Jensen v. Mullin, 14-CV-1337,

2016 WL 5394744, at *4 [N.D.N.Y. Sept. 27, 2016).  Here, the Court need not scrutinize

Defendant Bell's reliance on certain pieces of evidence at Plaintiff Emerenciano's Tier III

disciplinary hearing, because it is the hearing officer's responsibility, not the Court's, to make

determinations regarding a witness's credibility.  *See Hill*, 472 U.S. at 455 (explaining that

application of the "some evidence" standard does not require that the Court conduct an

independent assessment of the credibility of the witnesses).

     For all of these reasons, the Court grants Defendants' motion for summary judgment on

Plaintiff Emerenciano's First Amendment retaliation claim against Defendant Bell.

### 5.     Plaintiff Scott's First Amendment Retaliation Claim Against Defendant Houck

     Defendants argue that Plaintiff Scott has failed to show that, before Defendant Houck

authorized Scott's facility transfer, Houck had been aware of Scott's exercise of his

constitutional rights.  (Dkt. No. 69, Attach. 2, at 14-17 [Defs.' Mem. of Law].)  According to

Defendants, it was Plaintiff Scott himself who had requested the facility transfer.  (*Id.* at 16.)

Therefore, Defendants argue that Plaintiff Scott has not shown that there was a causal connection

between Defendant Houck's approval of Plaintiff Scott's facility transfer request and Scott's

communication with media outlets and elected officials who were seeking information on the

2015 prison escape of inmates David Sweat and Richard Matt.  (*Id.*)

     Plaintiffs respond that Defendant Houck retaliated against Plaintiff Scott by abruptly

facilitating his transfer from Clinton to the Green Haven hub.  (Dkt. No. 73, at 29-32 [Pls.'

Opp'n Mem. of Law].)  According to Plaintiffs, Defendant Houck retaliated against Plaintiff

Scott because Scott had communicated with outside entities, including the media and the *New York Times*, about the living conditions at Clinton.  (*Id.* at 29.)  More precisely, Plaintiffs argue that a jury could reasonably conclude, based on the nature and timing of Plaintiff Scott's transfer that, Defendant Houck retaliated against him by having him summarily removed from both the ILC and Clinton.  (*Id.*)

It is well established that a prison official may not transfer an inmate in retaliation for the exercise of a constitutional right.  *Smith v. Greene*, 06-CV-0505, 2010 WL 985383, at \*8 (N.D.N.Y. Feb. 3, 2010) (Baxter, M.J.) (citing *Davis v. Kelly*, 160 F.3d 917, 920 [2d Cir. 1998]) report-recommendation *adopted by* 2010 WL 985388 (N.D.N.Y. Mar. 16, 2010) (Suddaby, J.).

Plaintiff Scott has adduced admissible record evidence from which a rational jury could find that he engaged in constitutionally protected conduct when he communicated with reporters from the *New York Times* to discuss the overall environment and alleged mistreatment and abuse of incarcerated individuals by DOCCS staff at Clinton during the aftermath of the 2015 prison escape.  Plaintiff Scott has also adduced admissible record evidence from which a rational jury could find that he suffered adverse action by being transferred from Clinton to the Green Haven hub.

As a result, again, the issue before the Court is whether the causation element of a retaliation claim has been established.  To establish a causal connection between protected conduct and an adverse action, a plaintiff must show that "the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff."  *Ciaprazi v. Goord*, 02-CV-0915, 2005 WL 3531464, at \*6 (N.D.N.Y. Dec. 22, 2005) (internal quotation marks omitted).  When evaluating whether a causal connection exists between the protected conduct and the adverse action, a court may consider the following: "(1)

the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation." *Vega v. Artus*, 610 F. Supp.2d 185, 207 (N.D.N.Y. 2009).

To establish the third element of his retaliation claim, Plaintiff Scott relies primarily on the shortness of time between his making a transfer request and receiving a transfer (which was less than a month).[15]  (Dkt. No. 73, at 30 [Pls.' Opp'n Mem. of Law].)  Moreover, Plaintiff Scott argues that a jury could reasonably accept his testimony that "he did not want to go to the Green Haven hub, nor that he ever expected such a swift transfer that would prevent him completing his ILC term at Clinton."  (*Id.*)

Defendant Houck receives electronic reviews from individual correctional facilities, and based on these reviews, classifies inmates based on a security level.[16]  (Dkt. No. 69, Attach. 11, at 20-21 [Houck Tr.].)  Defendant Houck received Plaintiff Scott's facility transfer request on which he indicated that he wanted to be transferred to the Sullivan hub for programming purposes.  (Dkt. No. 69, Attach. 30, at 4.)  According to Defendant Houck, DOCCS staff at Clinton approved Plaintiff Scott's transfer request on October 9, 2015.[17]  (Dkt. No. 69, Attach.

---

[15]      In his role as a DOCCS classification analyst, Defendant Houck oversees inmate transfers between DOCCS correctional facilities.  (Dkt. No. 69, Attach. 7, at 2 [Houck Decl.].) At the beginning of each month, Defendant Houck receives several hundred transfer referrals from the DOCCS facilities.  (*Id.* at 3.)

[16]      The Court notes that inmates are reviewed on semi-annual basis for a potential facility transfer.  (Dkt. No. 69, Attach. 7, at 3 [Houck Decl.].)  This review includes an interview of the inmate.  (*Id.*)

[17]      Before Defendant Houck receives a transfer referral from a correctional facility, three DOCCS employees must ordinarily approve the referral: the offender rehabilitation coordinator ("ORC"), the supervising offender rehabilitation coordinator ("SORC"), and the deputy superintendent of programs.  (Dkt. No. 69, Attach. 7, at 2 [Houck Decl.].)

11, at 60 [Houck Tr.].)  On October 26, 2015, Plaintiff Scott was transferred from Clinton to the Green Haven hub.  (Dkt. No. 69, Attach. 31.)

However, although Plaintiff Scott had *requested* to be transferred to the Sullivan hub, there was no guarantee that DOCCS would have been able to accommodate his request.  Simply put, Plaintiff Scott overlooks the fact that he had no right to be confined to an institution of his choosing.  *See Davis*, 160 F.3d at 920 ("A prisoner has no liberty interest in remaining at a particular correctional facility.").

Generally, the most desirable DOCCS "hubs" (amongst inmates) are located in the downstate area of New York.[18]  (*Id.* at 5.)  As a result, these hubs have the longest waiting list for inmates seeking a transfer to them.[19]  (*Id.*)  Therefore, when an inmate requests to be transferred to a facility in any of the three downstate hubs, Defendant Houck selects a facility based on that inmate's preference, the availability of bed space at those facilities, and the relevant security concerns.  (*Id.*)  Ultimately, the goal of overseeing an inmate's facility request is to have the inmate transferred to the facility that is closest to his or her preferred location (subject to the available bed space and security considerations).  (*Id.*)  Finally, an inmate plays no part in making the final determination regarding which facility he or she is transferred to.  (*Id.*)

Moreover, the Court is not persuaded by Plaintiff Scott's argument that he "[n]ever expected such a swift transfer that would prevent him from completing his ILC term at Clinton." (Dkt. No. 73, at 30 [Pls.' Opp'n Mem. of Law].)  The Court notes that Plaintiff Scott could have submitted his facility transfer once his ILC term had ended (and not before) if he wished to

---

[18]     The Court notes that the most desirable DOCCs hubs include the Sullivan hub, the Green Haven hub, and the New York City hub.  (Dkt. No. 69, Attach. 7, at 5 [Houck Decl.].)

[19]     According to Defendant Houck, the wait time for inmates seeking a transfer to the Green Haven hub ordinarily takes approximately one year.  (Dkt. No. 69, Attach. 11, at 56 [Houck Tr.].)  However, the Sullivan hub experiences wait times approximately up to two years because of its small maximum-security orientation.  (*Id.* at 56-57.)

serve-out the remaining portion of his term on the ILC, or at least specified the time that he wanted to be transferred.  Given the other evidence in the case, it is of no consequence that Plaintiff Scott was transferred less than thirty days after submitting his request, because it is well-settled that "temporal proximity without more is insufficient to survive summary judgment." *Cooper v. Annucci*, 18-CV-0762, 2020 WL 8474802, at *14 (N.D.N.Y. Nov. 9, 2020) (Hummel, M.J.) (quoting *Flynn v. Ward*, 15-CV-1028, 2018 WL 3195095, at *11 [N.D.N.Y. June 7, 2018]).   Indeed, Plaintiff Scott could only "surmise" that his transfer was made in retaliation based on the relative speed at which his transfer had been processed.  (Dkt. No. 69, Attach. 13, at 76 [Scott Tr.].)  Such speculation, of course, is insufficient to create a genuine dispute of material fact.  *See Henson v. Gagnon*, 13-CV-0590, 2015 WL 9809874, at *12 (N.D.N.Y. Dec. 10, 2015) (Dancks, M.J.) ("[C]onclusory statements are not sufficient to support causation in retaliation claims; the claims must be supported by specific facts."), *report and recommendation adopted by*, 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016).

Finally, Plaintiff Scott argues that DOCCS is prohibited from transferring an inmate to another facility while that inmate is serving on the IGRC.[20]  (*Id.* at 30-31.)  The Court finds this argument to be unconvincing, because, as Plaintiff Scott himself correctly points out, he was not a member of the IGRC at the time of his transfer to the Green Haven hub.

For all of these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Scott's First Amendment retaliation claim against Defendant Houck.

### A.    Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Due Process Claims Against Them

      1.    Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Bell

---

[20]    The Court notes that 7 N.Y.C.R.R. § 701.4 details the procedures for removing an inmate from his or her role on the IGRC.

In their response to Defendant's motion for summary judgment, Plaintiffs have not opposed Defendants' request for judgment on Plaintiff Emerenciano's due process claim against Defendant Bell.  (Dkt. No. 73, at 7, n.2 [Pls.' Opp'n Mem. of Law].)  For these reasons, and the reasons stated in Defendants' memoranda of law, the Court grants Defendants' motion for summary judgment on this claim.

### 2.    Plaintiff Emerenciano's Fourteenth Amendment Due Process Claim Against Defendant Venettozzi

Defendants argue that the Court must grant summary judgment on Plaintiff Emerenciano's due process claim against Defendant Venettozzi, because Emerenciano has failed to establish Venettozzi's personal involvement in the alleged incidents giving rise to the violation of Emerenciano's due process rights.  (Dkt. No. 69, Attach. 2, at 18-19 [Defs.' Mem. of Law].)

Plaintiffs respond that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights, because the evidence shows that Defendant Venettozzi modified the Tier III disciplinary hearing officer's determination.  (Dkt. No. 73, at 35-36 [Pls.' Opp'n Mem. of Law].)  Moreover, the Second Circuit's ruling in *Tangreti*, Plaintiffs urge the Court to reconsider its dismissal of their supervisory claim against Defendants Annucci and Kirkpatrick based on their deliberate indifference.  (*Id.*)

The Court will address Plaintiffs' arguments out of order, beginning with the argument urging reconsideration of the Court's Decision and Order of September 23, 2019.  When a party files a motion for reconsideration, "[t]he standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusions reached by the court."  *Shrader v. CSX Transp.*, 70 F.3d 255,

257 (2d Cir. 1995).  Such a motion is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple[.]'"  *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 41 (2d Cir. 2012) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 [2d Cir. 1998].)

In support of Plaintiffs' sole argument for reconsideration (that, "even before *Tangreti*[,] the Second Circuit had indicated that there are cases where deliberate indifference is so egregious that it rises to and can satisfy a requisite unlawful discriminatory intent"), they fail to provide the Court with any new controlling decisions or data that it had overlooked in initially deciding the matter on Defendants' motion to dismiss.  (Dkt. No. 73, at 36 [Pls.' Opp'n Mem. of Law].)  In other words, Plaintiffs merely provided the Court with argument that it had already considered on the motion to dismiss.  For this reason, Plaintiffs' motion for reconsideration is denied as to the supervisory liability claims against Defendants Annucci and Kirkpatrick.

Turning to Plaintiffs' other argument (that Defendant Venettozzi was personally involved in the deprivation of Plaintiff Emerenciano's constitutional rights), the Court begins by observing that, in his role as the DOCCS' Director of Office of Special Housing and Inmate Discipline, Defendant Venettozzi oversees the appeals submitted by inmates stemming from their disciplinary hearing determinations.  (Dkt. No. 69, Attach. 12, at 23-24 [Venettozzi Tr.].)  Although Defendant Venettozzi's office does not supervise the disciplinary hearing officers, it does contact the hearing officer if an inmate appeals the hearing determination.  (*Id.* at 24.)  Among the DOCCS employees assigned to the Office of Special Housing and Inmate Discipline are support staff, two Correctional Facility Operations Specialists, one Lieutenant, one Captain, one Assistant Director, and one Director.  (*Id.* at 25.)  Defendant Venettozzi could not recall the

approximate number of disciplinary hearing reviews (i.e., appeals) that his office handled, but believed it was more than eight thousand per year.  (*Id.* at 30.)

Defendant Venettozzi had a limited understanding of the ILC and the nature of its meetings.  (*Id.* at 39-40.)  Defendant Venettozzi also expressed a general unfamiliarity with the inmate grievance process, and at his deposition could not recall receiving any formalized training on it.[21]  (*Id.* at 41.)  Defendant Venettozzi was also unfamiliar with IGRC Directive Number 4040 that detailing the prohibition on officer reprisals against inmates for filing grievances.  (*Id.* at 47.)

After the disciplinary hearing officer makes his or her determination, an inmate has the right to appeal that determination.  (*Id.* at 60.)  Defendant Venettozzi's office is designated by Commissioner Annucci to review all of the appeals stemming from Tier III disciplinary hearing determinations.  (*Id.*)  Upon Defendant Venettozzi's office receiving an appeal, it has 60 business days to either affirm, modify, or reverse the appeal.  (*Id.*)  There is no standard procedure for assigning specific appeals to specific members of Defendant Venettozzi's team. (*Id.* at 63-64.)  Once a member of Defendant Venettozzi's team reviews and comes to an initial decision on an inmate's appeal, either Defendant Venettozzi or the office's Assistant Director, Anthony Rodriguez ("Mr. Rodriguez"), must approve it.  (*Id.* at 66-67.)  For some appeals, Defendant Venettozzi approves the review decision without reviewing the hearing packet that accompanies the appeal.  (*Id.* at 67.)  Furthermore, Defendant Venettozzi has approved the review decision of appeals without reviewing the inmate's appeal letter.  (*Id.* 67-68.)  In other words, for efficiency purposes, Defendant Venettozzi and Mr. Rodriguez do not "do a complete and thorough stoppage and [conduct a] re-review of everyone's work."  (*Id.* at 68.)

---

[21]     The Court notes that, as a corrections officer, Defendant Venettozzi had never served on the IGRC.  (*Id.* at 42.)

According to Defendant Venettozzi, if an inmate claimed as his or her defense to disciplinary charges that he or she was retaliated against by a DOCCS employee, and that inmate was able to establish sufficient evidence of the alleged retaliation, then the disciplinary hearing officer should dismiss the charges against that inmate.  (*Id.* at 111.)  In previous instances, but not all of them, when Defendant Venettozzi had approved a reversal of a hearing officer's determination, he has spoken with hearing officers to offer them guidance in how to not make mistakes when issuing their determinations.  (*Id.* at 109-10.)

On October 19, 2015, the Office of Special Housing and Inmate Discipline received Plaintiff Emerenciano's appeal of his Tier III disciplinary hearing determination.  (Dkt. No. 73, Attach. 13.)  As a result of his adjudication of guilty of the charges set forth within the misbehavior report, Plaintiff Emerenciano received 270 days in the SHU, as well as a loss of privileges.  (*Id.* at 6.)

On April 19, 2016, after a review of Plaintiff Emerenciano's appeal, the Office of Special Housing and Inmate Discipline modified his punishment to 180 days in the SHU, effectively suspending 90 days of the initial punishment of SHU confinement and loss of privileges.  (Dkt. No. 69, Attach. 29.)

On April 16, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that the Office of Special Housing and Inmate Discipline had modified the determination of the disciplinary hearing that had found Plaintiff Emerenciano guilty of the charges contained within his misbehavior report issued by Defendant Dixon and had initially ordered him to serve 270 days in the SHU.  (Dkt. No. 69, Attach. 29.)  The memorandum stated that, "per conversation

with the Attorney General's Office, no substantial evidence to support the charges [against Plaintiff Emerenciano]."  (*Id.*)

      In an email dated April 15, 2016, from Assistant Attorney General Christopher Fleury ("AAG Fleury") to Defendant Venettozzi and Nancy Heywood, and copying Corey Bedard and Tanya Selvaag, AAG Fleury informed Defendant Venettozzi of his "real concerns regarding the allegations" made by Plaintiff Emerenciano and his counsel.  (Dkt. No. 73, Attach. 17.) Specifically, AAG Fleury stated that he did not believe, and a reviewing court would not believe, that the charges set forth in the misbehavior report had not been supported by substantial evidence.  (*Id.*)  AAG Fleury stated his conclusion was based on the testimony of five inmate witnesses who had corroborated the fact that Plaintiff Emerenciano made no such reference to a 1983 prison riot during an ILC meeting.  (*Id.*)

      A letter entitled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano to notify him that "[o]n behalf of the Commissioner and in response to . . . [his] appeal, . . . [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016."  (Dkt. No. 69, Attach. 29, at 2.)  Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter.  (*Id.*)  Also contained within the discovery exchanged in this case is a letter titled "Review of Superintendent's Hearing."  (*Id.* at 3.)  This letter was sent to Plaintiff Emerenciano to notify him that, "[o]n behalf of the Commissioner and in response to . . . [his] appeal, . . . [the] Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30, 2015.  (*Id.*)  This letter was electronically signed by Corey Bedard, who at the time was serving as the DOCCS Acting Director of Special Housing and Inmate Discipline.  (*Id.*)  According to Defendant Venettozzi, Plaintiff Emerenciano's Tier III disciplinary hearing determination was only modified, and not completely reversed, because

his office "did not believe that the appeal overrode what the hearing officer (i.e., Defendant Bell) put in [his determination] for evidence."  (Dkt. No. 69, Attach. 12, at 156 [Venettozzi Tr.].) Defendant Venettozzi was unaware of which DOCCS employee in his office had conducted the review of Plaintiff Emerenciano's appeal, and he was unable to recall details or any correspondence regarding the appeal.  (*Id.* at 157, 166.)

As discussed above in Part II.B. of this Decision and Order, "a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation" to establish his liability in a suit under § 1983.  *Grullon*, 720 F.3d at 138.  Among district courts in the Second Circuit, there has been a persistent split as to "whether an allegation that a defendant affirmed a disciplinary proceeding is sufficient to establish" that defendant's personal involvement in the underlying constitutional violation.  *Samuels v. Fischer*, 168 F. Supp.3d 625, 643 (S.D.N.Y. 2016); *compare Hinton v. Prack*, 12-CV-1844, 2014 WL 4627120, at *17 (N.D.N.Y. Sept. 11, 2014) (Kahn, J.) ("Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability.  We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement.") *with Murray v. Arquitt*, 10-CV-1440, 2014 WL 4676569, at *12 (N.D.N.Y. Sept. 18, 2014) ("The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement.") (Mordue, S.J.).

Relying on the Second Circuit's 2020 decision in *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)—"which eliminated special standards for supervisory liability and required that alleged constitutional violations be 'established against supervisory officials directly,' 983 F.3d at 618" two district courts within this circuit have found that "a defendant's 'fail[ure] to correct

another officer's violation" at a prison disciplinary hearing "does not suffice" to establish that

defendant's personal involvement in the alleged constitutional violations.  *Chavez*, 2021 WL

4248917, at *14 (citing *Washington v. Fitzpatrick*, 20-CV-0911, 2021 WL 966085, at *10

[S.D.N.Y. Mar. 15, 2021]).

     "'In general, the mere fact that a supervisory official affirmed the result of a disciplinary

hearing will not suffice to establish that official's personal involvement in an alleged

constitutional violation . . . .'"  *Caimite v. Rodriguez*, 17-CV-0919, 2020 WL 6530780, at *9

(N.D.N.Y. Apr. 9, 2020) (Hummel, M.J.) (quoting *Collins v. Ferguson*, 804 F. Supp.2d 134, 140

[W.D.N.Y. 2011]).  However, a supervisory official will be found to have been personally

involved if he or she "proactively participated in reviewing the administrative appeals as

opposed to merely rubber-stamping the results."  *Whitley v. Miller*, 57 F. Supp.3d 152, 161

(N.D.N.Y. 2014).

     In this case, a letter titled "Review of Superintendent's Hearing" was sent to Plaintiff

Emerenciano.  (Dkt. No. 69, Attach. 29, at 3.)  This letter notified Plaintiff Emerenciano that

"[o]n behalf of the Commissioner and in response to . . . [his] letter of appeal . . . [the]

Superintendent's hearing of October 8, 2015, has been reviewed and modified on November 30,

2015.  (*Id.* at 3.)  The letter contained an itemized breakdown of the modified penalties imposed

upon Plaintiff Emerenciano.  (*Id.*)  Corey Bedard's signature is affixed towards the bottom

portion of this letter.  (*Id.*)

     On April 19, 2016, Defendant Venettozzi sent an internal memorandum to the DOCCS

Superintendent of Great Meadow Correctional Facility, Christopher L. Miller, to inform him that

the Office of Special Housing and Inmate Discipline had reversed the determination of the

Superintendent's hearing that had found Plaintiff Emerenciano guilty of the charges contained

within his misbehavior report issued by Defendant Kowalowski.  (*Id.* at 1.)  The memorandum stated that, "per conversation with the [New York State] Attorney General's Office, no substantial evidence to support the charges."  (*Id.*)  A second letter titled "Review of Superintendent's Hearing" was sent to Plaintiff Emerenciano notifying him that, "[o]n behalf of the Commissioner. . . , [the] Superintendent's hearing of October 8, 2015, has been reviewed and administratively reversed on April 19, 2016."  (*Id.* at 2.)  Defendant Venettozzi's electronic signature is affixed towards the bottom portion of this letter.  (*Id.*)

To the extent that Plaintiff Emerenciano argues that Defendant Venettozzi's electronic signature affixed on the letter notifying him of the expunction of the charges constitutes personal involvement, the Court finds that *Whitley* is persuasive.  There, a judge of this District held that a modification of the plaintiff's punishment and a "typewritten form response" which stated that "there was not sufficient grounds to reconsider the previous decision on that hearing," and "do[es] not constitute sufficient evidence that either defendant proactively participated in reviewing the merits of [the plaintiff's] claim or had otherwise 'actively considered the issues raised by [plaintiff] in reviewing and responding to [his] appeal[s]' to give rise to a question of fact regarding either individual's personal involvement."  *Whitley*, 57 F. Supp.3d at 162.  As a result, the Court finds that Defendant Venettozzi's electronic signature does not constitute his personal involvement in Plaintiff Emerenciano's alleged due process deprivation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's Fourteenth Amendment due process claim against Defendant Venettozzi.

A.    **Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Supervisory Liability Claims Against Defendant Venettozzi**

 1.     **Plaintiff DeJesus' Supervisory Liability Claim Against Defendant Venettozzi**

Defendant Venettozzi argues that the Court must grant summary judgment in his favor as to Plaintiff DeJesus' supervisory liability claim against him, because DeJesus has failed to establish any grounds on which he could be held liable as a supervisor with regard to DeJesus' surviving retaliation claim against Defendant Dixon.  (Dkt. No. 69, Attach. 2, at 17-20 [Defs.' Mem. of Law].)

Plaintiffs respond that, given the totality of the circumstances, Defendant Venettozzi should not be rewarded with diminished liability because he ignored the unconstitutional violations occurring at Clinton after having received notice of them.  (Dkt. No. 73, at 32-38 [Pls.' Opp'n Mem. of Law].)  More specifically, Plaintiff DeJesus argues that Defendant Venettozzi violated his First Amendment rights because he failed to prevent the Defendant Dixon's retaliation and acted with deliberate indifference by not remedying the alleged constitutional violations in a timely manner.  (*Id.*)  Furthermore, Plaintiff DeJesus argues that Defendant Venettozzi was deliberately indifferent to the retaliation that he suffered, because "his actions . . . directly enabled, condoned, and ratified the unlawful retaliation being carried out against . . . Plaintiff DeJesus, such that it too can be said [that] Defendant Venettozzi . . . engaged in unlawful retaliation."  (*Id.*)  Therefore, argues Defendant DeJesus, a "jury can reasonably and readily conclude [that] Defendant Venettozzi was not only directly involved in the retaliation by virtue of his direct role in relation to their disciplinary appeals and by virtue of having not only created and/or tolerated a custom or policy through which retaliation against ILC members . . . , but that he was aware that the charges against these individuals were discriminatory by being directly and expressly based upon protected conduct and protected speech."  (*Id.* at 37.)

"It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora*, 08-CV-0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010) (Peebles, M.J.).  To prove a claim of failure-to-intervene, the plaintiff must establish that the officer-defendant had "(1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp.2d 501, 512 [S.D.N.Y. 2008]).

On March 8, 2016, counsel for Plaintiff DeJesus submitted a preliminary appeal from his Tier III disciplinary hearing determination to Defendant Venettozzi's office.  (*Id.* at 117.) Defendant Venettozzi's office received Plaintiff DeJesus' appeal on March 17, 2016.  (*Id.*)  On June 3, 2016, Defendant Venettozzi's office reversed the Superintendent's determination as to Plaintiff DeJesus' Tier III disciplinary hearing because the issued misbehavior report did not support the charges filed against Plaintiff DeJesus.  (*Id.* at 107-08, 121-23.)  As a result of the decision to reverse the Superintendent's determination, the two charges that had been brought against Plaintiff DeJesus were dropped.  (Dkt. No. 69, Attach. 23, at 1.)  Defendant Venettozzi acknowledged that every appeal reviewed by his office is evaluated on a case-by-case basis, and reviews, more likely than not, go much further in depth than merely reading the misbehavior report that was issued to the inmate.  (Dkt. No. 69, Attach. 12, at 119-21 [Venettozzi Tr.].)

Put simply, the evidence does not support Plaintiff DeJesus' argument regarding Defendant Venettozzi's failure to intervene in the alleged retaliation against DeJesus by Defendant Dixon.  Instead, Plaintiff DeJesus' argument assumes that, because of his title as the

Director of the Office of Special Housing and Inmate Discipline, Defendant Venettozzi knew, or

reasonably should have known, about Defendant Dixon's alleged retaliation against Plaintiff

DeJesus.  Additionally, Plaintiff DeJesus does not provide evidence showing *how* Defendant

Venettozzi "intentionally built and maintained a system . . . [that] tolerates a wrongful custom

and policy" of deliberate indifference towards unconstitutional retaliatory conduct.  (*Id.*)

       With regard to Plaintiffs' apparent argument that the length of time it took for Defendant

Venettozzi's office to review Plaintiff DeJesus' appeal was insufficient, Plaintiffs point to the

fact that, before the reversal of the disciplinary hearing officer's determination, counsel for

Plaintiff DeJesus and Plaintiff DeJesus himself contacted Defendant Venettozzi to alert him to

the pending appeal, and yet, the appeal was decided more than sixty days after it was received by

Defendant Venettozzi's office.  (Dkt. No. 73, at 34 [Pls.' Opp'n Mem. of Law].)  Of course,

"[r]eceiving letters of complaint from an inmate and failing to respond is generally insufficient

to establish personal involvement."  *Johnson v. McKay*, 14-CV-0803, 2015 WL 1735102, at *9

(N.D.N.Y. Apr. 16, 2015) (report-recommendation by Dancks, M.J., adopted by Sannes, J.);

*Smart v. Goord*, 441 F. Supp.2d 631, 643 (S.D.N.Y. 2006) (noting that the defendant "cannot be

held liable on the sole basis that he did not act in response to letter of protest by [plaintiff]");

*accord*, *Chaney v. Vena*, 15-CV-0653, 2017 WL 6756645, at *7-8 (N.D.N.Y. Nov. 29, 2017)

(Baxter, M.J.), *adopted by* 2017 WL 6734186 (N.D.N.Y. Dec. 29, 2017) (McAvoy, J.).

Plaintiffs do not specify the manner in which they "contacted" Defendant Venettozzi, nor the

extent of any communication that they might have had.  To the extent that Plaintiff DeJesus

argues that Defendant Venettozzi did not follow DOCCS policies regarding the sixty-day

deadline to decide an appeal, a failure to adhere to an internal policy or state law does not

constitute a violation of § 1983.  *H'Shaka v. Gorman*, 444 F. Supp.3d at 355, 384-85 (N.D.N.Y. 2020) (Suddaby, C.J.).

In any event, a violation of the 60-day deadline for a decision on such an appeal does not violate Plaintiff DeJesus' due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions.  *See Austin v. Fischer*, 09-CV-4812, 2010 WL 3187642, at *2 (S.D.N.Y. Aug. 11, 2020) ("Plaintiff alleges that the Commissioner issued a decision sixty eight days after Plaintiff's submission of his administrative appeal, exceeding the sixty-day limit set forth in . . . § 254.8 . . . .  However, this eight day delay does not violate Plaintiff's due process rights, because the Fourteenth Amendment does not require any administrative review of disciplinary convictions.") (internal quotation marks omitted), *aff'd*, 453 F. App'x 80 (2d Cir. 2011).

Finally, although there may be a genuine dispute of fact as to the degree of personal involvement that Defendant Venettozzi had in reviewing Plaintiff DeJesus' appeal, any such genuine dispute of fact is not a *material* one.  This dispute of fact lacks materiality because, even if Defendant Dixon had committed a constitutional violation by issuing a misbehavior report to Plaintiff DeJesus, Defendant Venettozzi's office *reversed* the Tier III disciplinary decision; it did not affirm or partially modify the hearing officer's determination.  In other words, Defendant Venettozzi's office did indeed intervene to correct the repercussions stemming from Defendant Dixon's alleged unlawful retaliation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi.

### 2. Plaintiff Emerenciano's Supervisory Liability Claim Against Defendant Venettozzi

Because Plaintiff Emerenciano has decided to abandon his due process claim against Defendant Bell, and pursue his due process claim against only Defendant Venettozzi, the Court need only focus on Venettozzi's actions while supervising Defendant Kowalowski in connection with Emerenciano's disciplinary hearing.

For his supervisory liability claim to survive the pending motion, Plaintiff Emerenciano must provide admissible evidence from which a rational jury could render the following three findings of fact: (1) that Defendant Venettozzi had a realistic opportunity to intervene and prevent Defendant Kowalowski from allegedly retaliating against Plaintiff Emerenciano; (2) that a reasonable person in Defendant Venettozzi's position would have known that Emerenciano's First Amendment rights were being violated; and (3) that Defendant Venettozzi did not take reasonable steps to intervene to prevent further alleged retaliation by Defendant Kowalowski. *Henry*, 2011 WL 5975027, at *4.

It is undisputed that, on November 30, 2015, Defendant Venettozzi's office modified the punishment that had initially been imposed upon Plaintiff Emerenciano after a finding of guilt at his Tier III disciplinary hearing. (Dkt. No. 69, Attach. 29, at 3-4.) It is also undisputed that, on April 16, 2016, Defendant Venettozzi's office ultimately reversed the finding of guilt. (*Id.* at 1-2.) As indicated above in Part III.C.1. of this Decision and Order, this reversal of a finding of guilt actually shows that Defendant Venettozzi did indeed intervene in Defendant Kowalowski's alleged unlawful retaliation. As a result, Plaintiff's theory of liability involves an argument that Defendant Venettozzi should have done so sooner: more specifically, that, when Venettozzi's office modified Plaintiff Emerenciano's punishment on November 30, 2015, Venettozzi should have reversed the finding of guilt.

The problem with this argument is that Defendant Venettozzi has no recollection of personally participating in that modification. (Dkt. No. 69, Attach. 12, at 138-67 [Venettozzi Tr.].) Furthermore, Plaintiff Emerenciano has no personal knowledge of such participation. Instead, he relies on Defendant Venettozzi's title as the head of the office that modified Plaintiff Emerenciano's punishment as the grounds for his supervisory liability, which is precisely the sort of *respondeat superior* theory of liability that has long been prohibited under the law. Finally, the record contains uncontroverted evidence that, the same day that Defendant Venettozzi learned of the concerns of an Assistant Attorney General regarding Plaintiff Emerenciano's disciplinary conviction, Venettozzi passed those concerns along to a subordinate; and the very next day Venettozzi's office reversed the finding of guilt. (*See, e.g.,* Dkt. No. 73, Attach. 17 [attaching email message dated April 15, 2016].) Simply stated, based on the current record, no reasonable jury could find Defendant Venettozzi liable for Defendant Kowalowski's alleged unlawful retaliation.

For these reasons, the Court grants Defendants' motion for summary judgment on Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 69) is **GRANTED in part** and **DENIED in part** as described above in this Decision and Order; and it is further

**ORDERED** that the Clerk of Court shall enter Judgment for Defendants on the following claims, which are **DISMISSED**:

(a)     Plaintiff Emerenciano's retaliation claim under the First Amendment against

Defendant Bell;

(b)     Plaintiff Scott's retaliation claim under the First Amendment against Defendant Houck;

(c)     Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Bell;

(d)     Plaintiff Emerenciano's due process claim under the Fourteenth Amendment against Defendant Venettozzi;

(e)     Plaintiff DeJesus' supervisory liability claim against Defendant Venettozzi; and

(f)     Plaintiff Emerenciano's supervisory liability claim against Defendant Venettozzi; and it is further

**ORDERED** that the following claims **<u>SURVIVE</u>** this motion for summary judgment:

(a)     Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Dixon;

(b)     Plaintiff DeJesus' retaliation claim under the First Amendment against Defendant Rock; and

(c)     Plaintiff Emerenciano's retaliation claim under the First Amendment against Defendant Kowalowski; and it is further

**ORDERED** that the Clerk of Court shall **TERMINATE** the following individuals as Defendants in this action: Earl Bell, Richard Houck, and Donald Venettozzi.

Dated: March 31, 2022
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge